UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| GOODSON DRUG CO., INC. a<br>Georgia business corporation, and<br>J. LEE GOODSON,<br><br>    Plaintiffs,<br><br>    *vs.*<br><br>PAMELA JO ("Pam") BONDI, in her<br>official capacity, TODD WALLACE<br>BLANCHE, in his official capacity,<br>TERRANCE C. ("Terry") COLE,<br>Administrator of the United States<br>Drug Enforcement Administration,<br>in his official capacity, and THE UNITED<br>STATES DRUG ENFORCEMENT<br>ADMINISTRATION,<br><br>    Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION FILE NO.:<br><br>_____ |

## <u>VERIFIED COMPLAINT</u>

**COME NOW** the Plaintiffs, **GOODSON DRUG CO., INC**. (herein "Goodson Pharmacy" or the "Pharmacy"), a Georgia business corporation, and **J. LEE GOODSON** (herein "Lee Goodson"), complaining of the Defendants, and each of them, and respectfully show to the Court as follows:

1.

This is an action seeking federal judicial review of administrative actions of the United States Drug Enforcement Administration (the "DEA"). The actions that are the subject of this Complaint constitute a gross regulatory over-reach and have critically injured the Plaintiffs, their fellow pharmacists, the physicians who have written lawful prescriptions to be filled by Plaintiffs, and the patients of such physicians and customers of the Plaintiffs.

The Plaintiffs have exhausted their available administrative remedies, in that Plaintiffs undertook to appeal, administratively, the unlawful and irrational decisions of the DEA through the applicable administrative processes. However, the DEA has failed and refused to provide an Administrative Law Judge ("ALJ") to hear their appeal and ordered that its own administrative processes are indefinitely stayed.

The DEA is legally bound by its own administrative regulations, but it has failed to follow them. The exercise of this Court's injunctive power is necessary, including temporary and preliminary relief, to require that the DEA follow its own administrative regulations. Also, this Court's powers under the *Declaratory Judgment Act* should be exercised in order to provide guidance to the DEA as to its responsibilities under the *Administrative Procedure Act* (the "APA") and the *Controlled Substances Act* (the "CSA"). Plaintiffs will show further that the DEA's

administrative structure and general procedures violate constitutional principles, and that such claims are subject to judicial review pursuant to the Supreme Court's decision in *Axon v. Federal Trade Commission*.

## THE PARTIES

### *The Plaintiffs*

2.

Goodson Pharmacy is an independent, third-generation family-owned business that has been a fixture on the Courthouse Square in Cumming, Forsyth County, Georgia since July 1959.

3.

Lee Goodson has been a pharmacist licensed by the Georgia State Board of Pharmacy, since July 2009.

4.

Since at least the 1970's, Goodson Pharmacy has been registered with the DEA, until the events giving rise to the present action, under DEA number AG7193799, as a pharmacy licensed to dispense prescriptions subject to the CSA. Throughout his career, Lee Goodson has been a pharmacist licensed, under such number, to dispense prescriptions subject to the CSA.

5.

Goodson Pharmacy is a Georgia corporation, in good standing, licensed to own and operate a pharmacy by the Georgia State Board of Pharmacy (the "Board of Pharmacy").

6.

Goodson Pharmacy, as a corporation, is licensed by the Board of Pharmacy pursuant to a determination that it has met the facility and equipment and operating standards required by the Board of Pharmacy and the Georgia Drugs and Narcotics Agency.

7.

Goodson Pharmacy has a "Pharmacist in Charge," who is a licensed pharmacist responsible for Goodson Pharmacy's overall operation and its compliance with all State and federal statutes and regulations.

8.

Since 2021, Lee Goodson has been the Pharmacist in Charge of Goodson Pharmacy.

9.

The dispensing of controlled substances at Goodson Pharmacy is performed only by individually licensed pharmacists.

10.

Lee Goodson owns all of the capital stock of Goodson Pharmacy.

11.

At the present time, nine (9) licensed pharmacists practice at Goodson Pharmacy.

### *The Defendants*

12.

The Defendant, Pam Bondi, is the 87th Attorney General of the United States, and she is the principal officer of the United States Department of Justice (the "DOJ"), of which the DEA is a component law enforcement and administrative agency. Defendant Bondi is responsible for compliance by the DEA with all applicable statutes and regulations.

13.

Defendant Bondi, in her official capacity, is the senior administrative officer of the Office of the Attorney General. Defendant Bondi is an officer of the United States.

14.

Title 28 C.F.R. § 0.102, "*Drug Enforcement Policy Coordination*," provides that "[t]he Administrator of the Drug Enforcement Administration shall report to the

Attorney General, through the Deputy Attorney General or the Associate Attorney General, as directed by the Attorney General."

15.

By Order of the Attorney General, such reporting is currently through the Deputy Attorney General, Defendant Blanche. Defendant Blanche is an officer of the United States.

16.

Defendant DEA is a component law enforcement and regulatory agency of the United States.

17.

The DEA is an administrative agency of the United States.

18.

Defendant Blanche is the officer of the United States tasked with supervision of the activities of the DEA and reporting such supervisory activities to the Attorney General.

19.

Defendant Cole, as Administrator, is the principal officer of the DEA, and he is an officer of the United States. Defendant Cole reports to Defendant Blanche with respect to the activities of the DEA.

20.

Defendants Bondi, Blanche, and Cole are responsible for the proper functioning of the DEA, including, but not limited to, taking care that the laws and regulations of the United States are properly administered and applied to those parties subject, by statute, to the regulatory jurisdiction of the DEA.

21.

The DOJ and the DEA have been mandated by the CSA, 21 U.S.C. § 801 *et seq.*, to undertake certain responsibilities with respect to the manufacture, distribution, prescription, and sale of pharmaceuticals over which the United States has asserted control.

22.

The DOJ and DEA have asserted regulatory jurisdiction, including investigatory powers, over those aspects of the retail pharmacy business that implicate the CSA.

## **JURISDICTION AND VENUE**

23.

This Court has original subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, granting this Court jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." This controversy arises under

the U.S. Constitution and statutes of the United States, including, *inter alia*,  the

CSA, the APA, and the *Declaratory Judgment Act*.

24.

This Court has jurisdiction to hear this matter and dissolve the Immediate

Suspension Order, issued by the DEA to Goodson Pharmacy on May 1, 2025 (the

"ISO"), pursuant to 21 U.S.C. § 824(d)(1) of the CSA, which establishes judicial

review of suspension orders issued by the Attorney General.

25.

This Court also has original subject matter jurisdiction, pursuant to 28 U.S.C.

§ 1332(a)(1), in that this action is between citizens of different States, in which the

matter in controversy exceeds the value of $75,000.00, exclusive of interest and

costs.

26.

Pursuant to the *Mandamus and Venue Act of 1962*, codified as 28 U.S.C. §§

1361 and 1391(e), this Court has original personal and subject matter jurisdiction of

actions against officials of the United States government, seeking to compel them to

perform their official duties. Section 1361 provides:  "The district courts shall have

original jurisdiction of any action in the nature of mandamus to compel an officer or

employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

27.

This is an action "in the nature of mandamus" to compel an agency of the United States and officers of the United States to perform their official duties under, *inter alia*, the Fifth Amendment to the United States Constitution, the doctrine of separation of powers, the APA, and the CSA.

28.

28 U.S.C. § 1391(e)(1) prescribes the appropriate venue for actions in which the Defendants are officers of the United States:

> A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, ***may***, except as otherwise provided by law, ***be brought in any judicial district in which*** … (B) a substantial part of the events or omissions giving rise to the claim occurred, … or (C) ***the plaintiff resides*** if no real property is involved in the action. … [Emphasis supplied.]

29.

Venue is proper in this District. This cause of action arose in the Northern District of Georgia, and the Plaintiffs are residents of the Northern District of Georgia.

30.

Goodson Pharmacy is located in Forsyth County, Georgia.  Forsyth County is within the United States District Court for the Northern District of Georgia.  Lee Goodson is a citizen and resident of Cumming, Forsyth County, Georgia.

31.

Venue is proper in this Division.  Forsyth County is within the Gainesville Division of the United States District Court for the Northern District of Georgia.

32.

The Defendants, and each of them, are personally subject to the jurisdiction of this Court.

33.

28 U.S.C. § 1391(e)(2) provides that service of the Summons and Complaint in such an action, in the nature of mandamus, may be made by certified mail.

## OPERATIVE FACTS

## I.    Background and Procedural History

34.

Pursuant to its claimed regulatory power, the DEA has conducted an investigation of Goodson Pharmacy that commenced around March 2024 and is continuing until the commencement of this action.

35.

The DEA's investigation of Goodson Pharmacy was conducted by the Diversion Control Division of the DEA.

36.

Goodson Pharmacy and Lee Goodson have fully cooperated with the DEA's investigation, providing the DEA with all information requested from the Pharmacy.

37.

Goodson Pharmacy has been registered with the DEA pursuant to the CSA since the 1970's.

38.

The Certificate of Registration (the "Registration") of Goodson Pharmacy has never been previously suspended or revoked.

39.

For many years, Goodson Pharmacy, without incident, filled prescriptions for medications scheduled under the CSA, including opioids. To Plaintiffs' best recollection and understanding, Goodson Pharmacy has never knowingly filled a forged, stolen, or otherwise improper or medically unnecessary prescription for a controlled substance.

40.

Goodson Pharmacy, to the knowledge of Plaintiffs, has never knowingly filled a prescription written by a physician who was not registered with the DEA.

41.

When presented with improper prescriptions, Goodson Pharmacy has refused to fill such prescriptions.

42.

In response to a DEA investigation involving recordkeeping issues initiated in December 2018, Goodson Pharmacy and the DEA entered into a *Memorandum of Agreement* that required Goodson Pharmacy to take certain reporting actions for a period of three years. Goodson Pharmacy complied with the terms of the *Memorandum of Agreement*, which expired in February 2022.

43.

The DEA issued a subpoena for the records of 39 patients of Goodson Pharmacy in March 2024. Goodson Pharmacy provided the requested records on or around March 27, 2024.

44.

In March 2024, Goodson Pharmacy voluntarily discontinued dispensing prescriptions for Carisoprodol (commonly known as "Soma"), an FDA-approved

medication used to relieve discomfort from acute, painful musculoskeletal conditions, when prescribed along with a benzodiazepine and an opioid. This decision was made based on the growing consensus within the medical community to shift away from the use of Soma in favor of other alternatives.

45.

In November 2024, Goodson Pharmacy suffered a devasting fire at its historic site on the Courthouse Square in Cumming.  Goodson Pharmacy temporarily relocated to another site on the Courthouse Square and, as required by DEA regulations, filed a modification of its Registration to account for the relocation. A modification with the Board of Pharmacy was also filed and approved.

46.

On February 25, 2025, the DEA issued a second subpoena, requesting additional records from March 1, 2024, to February 24, 2025, for six patients that were subject to the prior March 2024 subpoena. Goodson Pharmacy provided the requested records on March 6, 2025.

47.

The DEA never approved the modification of Goodson Pharmacy's Registration under the CSA.  Thus, Goodson Pharmacy has been unable to dispense controlled substances since November 2024 and will not be  able to dispense

controlled substances until October 2025, at the earliest, when it plans to return to its previous site, which is undergoing repair and renovation.

48.

To date, Goodson Pharmacy believes that the ongoing investigation is, at least in part, motivated by animus against this Pharmacy specifically and against pharmacies more broadly. During a phone call with a Goodson Pharmacy employee, Brian Curtis, the DEA Group Supervisor for Central to Northern Georgia, made troubling remarks in which he boasted about his past efforts in Florida, claiming a 100% success rate in revoking pharmacy registrations. Such comments were wholly inappropriate and appeared to serve no legitimate investigative purpose. Rather, they seemed intended to intimidate and pressure Goodson Pharmacy into voluntarily surrendering its Registration.

49.

On information and belief, Mr. Curtis has told DEA Diversion Investigator Ethan Hutnick to "find a reason" to revoke Goodson's Registration because Mr. Curtis considers the volume of opioids dispensed by Goodson Pharmacy to be too high.  In fact, the volume of opioids dispensed by Goodson Pharmacy is not unreasonable in light of the total patients Goodson Pharmacy serves, and the number of opioids dispensed as a percentage of total medications dispensed, and the total

number of controlled substances dispensed by the Pharmacy are within industry norms.

50.

In its Order to Show Cause and Immediate Suspension of Registration, issued on May 1, 2025 (the "Order"), the DEA does not contend that Goodson Pharmacy's Registration should be revoked based on the volume of opioids dispensed.

51.

After receiving the records of the requested 39 patients, the DEA made no effort of any kind to ask Lee Goodson or any other employee of Goodson Pharmacy any questions relating to the medical necessity of any of the prescriptions of those patients. For example, the DEA did not ask why certain medications were dispensed to patients who do not live in the Cumming, Georgia area, something the DEA considers to be a "red flag." The DEA did not ask why pharmacists at the Pharmacy had dispensed medications making up the so-called "Trinity Cocktail" (an opioid, a benzodiazepine, and carisoprodol) to a small number of patients. The DEA did not ask why a small number of patients received prescriptions for opioids from several different doctors within the course of a year.

52.

Had the DEA asked, it would have learned that Goodson Pharmacy had confirmed the medical necessity of the "Trinity Cocktail" prescriptions by speaking with the prescribing physicians, and that Goodson Pharmacy had stopped dispensing that "Cocktail" in March 2024; it would have learned that the small number of patients who had received opioid prescriptions from multiple doctors were actually seeing multiple doctors within the same practice as a matter of scheduling convenience, and were not "doctor shopping; it would have learned that the few "out of area" patients who received medications were either visiting the Cumming, Georgia area or had recently moved to the area; and it would have learned that the single patient who had received "early refills" had received those refills at the instructions of her doctor, who's office noted on the prescriptions that the early refills were appropriate and that the reasons the early refills were medically necessary.

53.

On information and belief, DEA did not ask these questions prior to issuing its Order because the answers would have impaired its efforts to initiate the Order to Show Cause proceedings and immediately suspend Goodson Pharmacy's Registration.

54.

On April 9, 2025,  counsel for the pharmacy submitted a letter to the DEA providing facts explaining the Pharmacy's reasoning for prescribing to certain patients that the DEA may have  targeted as "out of area" patients. In the letter, counsel indicated that a similar letter would be provided for patients who were likely targeted for certain dosages and drug combinations. The DEA confirmed receipt but never provided a substantive response or requested additional information. Before Goodson Pharmacy could provide the referenced additional information, the DEA initiated its Order to Show Cause proceedings against Goodson Pharmacy.

55.

On May 1, 2025, the DEA issued the Order. Pursuant to the Order, Goodson Pharmacy was, purportedly, barred, immediately, from dispensing controlled substances, because its continued Registration posed an "imminent danger to the public health or safety." *See Order*, p. 1 (a true and correct copy of the Order is attached hereto as Exhibit A).

56.

The Immediate Suspension of a pharmacy's Certificate of Registration without prior notice and an opportunity to be heard is extraordinary relief that is only

to be sought and only granted where there is an "imminent danger to the public health or safety." 21 U.S.C. § 824(d)(1).

57.

There was no "imminent danger to the public health or safety" supporting the DEA's issuance of the ISO.

58.

Goodson Pharmacy was, at that time of the issuance, not dispensing any controlled substances of any kind due to the fire, and would not be in any position to resume dispensing controlled substances for months.

59.

Moreover, the DEA waited over 14 months from the initiation of its investigation before issuing the ISO. If there had been a genuine "imminent danger to public health or safety," as the statute requires, the DEA would have acted with far greater urgency. This delay undercuts any claim of true immediacy and suggests the ISO was issued for punitive, rather than protective, purposes.

60.

In its Order, the DEA alleged that, between January 2019 to November 2024, Goodson Pharmacy dispensed controlled substances to eight identified patients—representing only 0.05% of the estimated 15,000 patients served between that

period—while purportedly failing to comply with federal and Georgia state laws. Specifically, the allegations include dispensing prescriptions without verifying a legitimate medical purpose and filling prescriptions that presented unresolved "red flags" suggestive of potential abuse or diversion. Such alleged "red flags" include "drug cocktails," "doctor shopping," patients traveling long distances, and early refills.

61.

The DEA's Order relies on legal assertions and categorizations, such as "drug cocktails" and "doctor shopping," that are not grounded in or defined by any federal or Georgia state statutes, rules, or regulations, rendering such assertions arbitrary and capricious.

62.

On May 30, 2025, pursuant to 21 C.F.R. §§ 1309.46 and 1316.47, Goodson Pharmacy filed its Answer to the Order and its Request for Hearing, disputing the allegations in the Order and seeking administrative review of the DEA's preemptory determination. True and correct copies of the Answer and Request for Hearing are attached hereto as Exhibits "B" and "C", respectively.

63.

In its Answer, Goodson Pharmacy asserted that the prescriptions cited in the Order were issued for legitimate medical purposes and that any potential red flags were resolved, in coordination with the prescribing physicians and patients, prior to dispensing. *See generally Exhibit B*.

## A.    *"Drug Cocktails"*

64.

The claimed violations by Plaintiff include filling facially valid prescriptions for a drug "Cocktail" known as the "Trinity Cocktail." It is the DEA's informal rule that this drug combination is inherently suspect and should only be prescribed and dispensed in extremely rare, undefined circumstances.

65.

In fact, this combination medication has been deemed to be an essential tool in the treatment of acute, otherwise un-remediable pain.  The "Trinity Cocktail" has never been outlawed by State or federal statute or by any rule-making procedure involving notice and an opportunity to comment. In certain cases, depending on the patient's condition and treatment regimen, this type of combination therapy, when agreed upon by reasonable prescribing physicians and pharmacists, clearly serves a legitimate medical purpose.

66.

Goodson Pharmacy dispensed controlled substances to each patient referenced in the Order *only after conducting* a comprehensive review of their prescription history, appropriately identifying and resolving any potential "red flags," and confirming that each prescription was issued by a licensed practitioner for a legitimate medical purpose.

67.

All resolutions were documented in accordance with Georgia's professional standards of pharmacy practice.

68.

All resolutions were made in close coordination with the prescribing physicians and aligned with the patients' individualized treatment plans. Through direct communication with the treating providers, Goodson Pharmacy verified that each patient's medical condition justified the prescribed regimen and that the clinical rationale supported the therapeutic use of the medications.

69.

Furthermore, it's clear from Georgia's Prescription Drug Monitoring Program (the "PDMP") that certain patients, including Patient T.M. and Patient L.W.,

continued their regimens with other pharmacies, such as CVS Pharmacy and Walgreens, after Goodson Pharmacy was no longer able to fill their prescriptions.

70.

Upon information and belief, in connection with the patients who have continued their regimens at other pharmacies, none of those pharmacies or prescribing physicians have received a DEA Order to Show Cause or Immediate Suspension Order regarding their DEA Certificate of Registration in connection with those specific prescriptions.

71.

The DEA had access to these PDMP records and should have been aware that these patients continued their regimens even after switching to a new pharmacy.

72.

The DEA failed to consider critical information relevant to the circumstances which Goodson Pharmacy attempted to, and was willing to, provide. Moreover, the DEA's stated rationale contradicts the evidence that was available to it at the time.

**B.    *"Doctor Shopping"***

73.

The DEA also alleges that Patients S.P., T.M., L.B., C.Y., and R.D. were engaged in "doctor shopping," which the DEA defines in the Order as "occur[ing]

when a patient visits multiple practitioners to obtain multiple controlled substance prescriptions." *Exhibit A*, p. 7.

74.

There is no federal statute or DEA rule that clearly defines what "doctor shopping" is. Nor is there clear guidance from published DEA ALJ decisions.

75.

In a recent Notice published by the DEA concerning production quotas for Schedule I and II controlled substances, the DEA provided a definition that contradicts the definition used in the Order, stating that "doctor shopping," is "a scheme in which a patient obtains controlled substances from multiple treatment providers without the providers knowing of the other prescriptions." *Established Aggregate Production Quotas for Schedule I and II Controlled Substances and Assessment of Annual Needs for the List I Chemicals Ephedrine, Pseudoephedrine, and Phenylpropanolamine for 2021*, 85 FR 76604-0373.

76.

This is a clear example of the DEA imposing an obligation on pharmacists to evaluate their customers' prescriptions for behavior that lacks a clearly defined standard. Failure to do so—based on the DEA's often ambiguous and inconsistent

interpretations—can result in the revocation of a pharmacy's Certificate of Registration.

77.

A review of the named patients' records makes clear that the DEA's allegations are unfounded and reflect a troubling willingness to misrepresent the facts in order to construct the appearance of violations. It is not uncommon for patients to see multiple specialists, transition between providers, or seek care from emergency or urgent care facilities. In many cases, the prescribing physicians were affiliated with the same medical practice or were treating distinct medical conditions as part of a coordinated and legitimate treatment plan—facts that are clearly documented in the patients' prescription histories.

78.

**Patient S.P.**: The DEA alleges that between January 2019 and November 2024, Goodson Pharmacy filled prescriptions for controlled substances for Patient S.P. from 13 different prescribers. However, the patient records provided by Goodson Pharmacy to the DEA demonstrate that these prescribers were affiliated with only four distinct medical practices: (1) Cornerstone Family Medicine, where Patient S.P. visited Doctor Tammy Finley, her primary care physician, with whom she had over a 12 year history; (2) Northside Family Medicine, LLC, where she

visited Dr. Haroon Rashid for assistance with weight loss, and with whom she had a seven year history; (3) Summit Spine and Joint Centers (also known as "Georgia Pain and Wellness Center"), where she visited multiple physicians, and with whom she had over a 12 year history, including Doctors Srinand Mandyam, Oluwasegun Lijofi, Shawn Banon, Sandeep Vaid, Darius Zagunis, Doug Freiberger, Thomas Cheriyan, Gabriel Marrero, An Do, Gerald Chai, and Amod Surek; and (4) Dr. Sofia Zaman Khan. Of those practices, only Summit Spine and Joint Centers prescribed opioids.

79.

**Patient T.M.**: The DEA alleges that between January 2019 and November 2024, Goodson Pharmacy filled prescriptions for controlled substances for Patient T.M. from eight different prescribers. However, the patient records provided by Goodson Pharmacy to the DEA demonstrate that these prescribers were affiliated with only four distinct medical practices: (1) Goyco Internal Medicine, where Patient T.M. visited Doctor Otto Goyco and Physician's Assistants Josclyn Sebestyen and Brandi Johnson; (2) Pain Physicians of Atlanta, where she visited Doctors Kenneth Joel, Ravi Dammanna, and Shazad Wada; (3) Doctor Scott Beach, where she received a single prescription for a benzodiazepine in connection with a procedure; and (4) the Emergency Department at Northside Hospital, where she visited Doctor

Rutveej Patel and received a single prescription for Oxycodone 20 mg. Of those practices, only Pain Physicians of Atlanta and the Emergency Department of Northside Hospital issued opioids, and with Northside Hospital, it was a onetime issuance for a procedure.

80.

**Patient L.B.**: The DEA alleges that between January 2019 and October 2024, Goodson Pharmacy filled prescriptions for controlled substances for Patient L.B. from 5 different prescribers. However, the patient records provided by Goodson Pharmacy to the DEA demonstrate that these prescribers were affiliated with only three distinct medical practices: (1) Cumming Family Medicine, where Patient L.B. visited Doctors Jeevana Krishna and Anjali Dua; (2) Northside Forsyth Hospital, where she visited Doctors Kimberely Lariet and Wathi Pabba for emergency care on two separate occasions, and for each visit, only received a 3-day supply of an opioid; and (3) Atlanta Oral and Facial Surgery, where she visited Doctor Jonathon Threadgil, a dentist, and received only a 2-day supply of an opioid following an acute dental procedure.

81.

**Patient C.Y.**: The DEA alleges that between December 2018 and June 2023, Goodson    Pharmacy    filled    prescriptions    for    controlled    substances    and

cyclobenzaprine (Flexeril) which is non-controlled for Patient C.Y. from five different prescribers.[1] However, the patient records provided by Goodson Pharmacy to the DEA demonstrate that these prescribers were affiliated with only three distinct medical practices: (1) Suwanee Pain Management Center, where he visited Dr. Anthony Ditaranto; (2) Morrow Family Medicine, where he visited Doctors James Morrow and Patrick Kindergran; and (3) Doctor Stephen Fleming, his psychiatrist, from whom he received a single Adderall prescription. Of those practices, only Suwanee Pain Management Center issued opioids.

82.

**Patient R.D.**: The DEA alleges that between January 2021 and November 2024, Goodson Pharmacy filled prescriptions for controlled substances for Patient R.D. from five different prescribers. However, the patient records provided by Goodson Pharmacy to the DEA demonstrate that these prescribers were affiliated with only three distinct medical practices: (1) Suwanee Pain Management Center, where Patient R.D. visited Dr. Ditaranto; (2) Cumming Family Medicine, where she visited Doctors Jeevana Krishna and Anjali Dua, after she stopped seeing Dr.

---

[1] The DEA also names Dr. Alexander Gross, a dermatologist, as a prescriber; however, the reference to Dr. Gross is false because the Pharmacy made a clerical error in choosing the wrong physician on the prescription. The prescription provided to the DEA demonstrates that Dr. Anthony Ditaranto was the medical provider seen by the patient and is the one who issued the respective prescription.

Ditaranto; and (3) Nile OBGYN, where she visited Doctors Hughan Frederick and Richard Glover for Phentermine for weight loss. Of those practices, only Suwanee Pain Management Center and Cumming Family Medicine issued opioids.

83.

All of the foregoing explanatory information was readily available to the DEA within the patients' records and would have been further clarified had the DEA afforded Goodson Pharmacy an opportunity to explain and supplement its production.

### C.    *"Patients Traveling Long Distances"*

84.

The DEA alleges that Patients L.W., S.P., and T.A. traveled long distances to either visit their prescribing physician or Goodson Pharmacy to have their prescription filled. The "red flags" cited by the DEA concerning patients traveling long distances were either inapplicable under the circumstances or were properly addressed and resolved in accordance with Georgia's standard of care.

85.

Patient L.W. traveled approximately 70 miles from her hometown to see Dr. Shannon Mize in Cumming due to a longstanding doctor-patient relationship. Dr. Mize provided concierge medical services to L.W., which reasonably justified the

distance traveled. This is a fact supported by the patient's medical records, which were provided to the DEA.

86.

Similarly, the DEA's claim that Patient S.P. traveled to Gainesville and Lawrenceville to seek medical care is inaccurate. Patient S.P. was under the care of physicians whose practice-maintained offices in Cumming, Gainesville, and Lawrenceville; however, all of her visits occurred at the Cumming, Georgia location.

87.

As for Patient T.A., she regularly traveled between Jesup, Georgia, and Cumming to visit family, and during those visits, she saw her longtime primary care physician in Cumming. Patient T.A. had provided Goodson Pharmacy with a valid Georgia driver's license listing a Cumming address, as reflected in the customer notes provided to the DEA. Based on this information, Goodson Pharmacy reasonably believed Patient T.A. was a local resident.

**D.    "Early Refills"**

88.

The DEA also alleges that Patients L.W. received early refills, which was supposedly a "red flag" that was not properly addressed. However, the early dispensing of prescriptions was clinically justified, based on specific circumstances,

including the patient's travel schedule and two separate injuries sustained during the relevant time period, which required adjustments to her medication regimen. The early refills were appropriately documented in the patient's records and made in coordination with Patient L.W.'s treating physician, Dr. Shannon Mize.

## II.    The Indefinite Stay

### 89.

Subsequent to filing its Answer and Request for Hearing, Goodson Pharmacy commenced its preparation for its adjudicatory hearing, seeking to set aside the DEA's unlawful and factually false determination. Such preparation included retaining two expert witnesses, preparing and filing a Statement, and preparing to attend the ALJ's Prehearing Conference. A true and correct copy of the Prehearing Statement is attached hereto as Exhibit "D".

### 90.

On July 23, 2025, Chief Administrative Law Judge, John J. Mulrooney, II filed an Order Staying Hearing Proceedings indefinitely on account of ALJ Mulrooney's retirement on August 1, 2025. A true and correct copy of the Order Staying Hearing Proceedings is attached hereto as Exhibit "E".

91.

The Order Staying Hearing Proceedings stated that, since ALJ Mulrooney was the only ALJ currently hearing DEA cases, that the proceedings were stayed until a replacement ALJ was identified, appointed, and assigned to hear the case. *See Exhibit E*, p. 1.

92.

Upon inquiry, counsel to the DEA confirmed that now-retired ALJ Mulrooney was the *only* ALJ at the DEA and that the preemptory suspension of the Goodson Pharmacy's Registration would remain in full force and effect during the "indefinite stay." Presently, Plaintiffs cannot challenge the immediate suspension of their Registration and cannot "show cause" at a hearing why their Registration should be reinstated.

93.

Goodson Pharmacy, and each of its pharmacist-employees, including Lee Goodson, are prepared to show that they have violated *no* applicable statute or regulation relating to the dispensing of controlled substances and that the factual bases of the DEA's suspension were false and that the DEA's Diversion Control Division has been shown that such factual bases were false.

94.

Goodson Pharmacy has inquired with the DEA what the process for appointing a new ALJ entails and how long that process may take.

95.

The DEA has informed Goodson Pharmacy that this is an unprecedented occurrence and that they are unable to provide an estimate of when a new ALJ will be identified, appointed, and assigned to hear Goodson Pharmacy's case. The DEA further explained that when an ALJ is finally appointed, they will still need to undergo extensive training before they are able to take on DEA cases, such as Goodson Pharmacy's.

96.

Goodson Pharmacy is prepared to proceed with the administrative proceedings with any fair-minded ALJ, especially an ALJ who has not been "trained" for the DEA.

97.

The preemptory suspension of Plaintiffs' Registration to dispense controlled substances has, effectively, become a permanent suspension, made without notice or an opportunity to be heard before an impartial decision-maker.

98.

The suspension of the Plaintiffs' Registration, as a matter of fact and law, has become a final agency decision.

99.

In Plaintiffs' circumstances, the DEA has failed to provide an ALJ for purposes of challenging the ISO or for a hearing on the merits regarding Goodson Pharmacy's Registration.

100.

As alleged herein, the Plaintiffs will suffer irreparable professional and financial harm unless this Court exercises its equitable powers in order to require the DOJ and the DEA to comply with its own regulations and provide the Plaintiffs with an adjudicatory hearing.

101.

As alleged herein, the Plaintiffs will suffer irreparable professional and financial harm unless this Court exercises its judicial powers of oversight of federal administrative agencies, as provided by, *inter alia*, the APA, and holds unlawful the regulatory regime imposed by fiat under the aegis of "the public interest."

102.

Since November 2024, Goodson Pharmacy's "script count" has decreased compared to the prior year. In January 2024, Goodson Pharmacy filled 13,778 prescriptions, and in January 2025, it filled only 5,601, a decrease of almost 60%. For each month of 2025, Goodson Pharmacy has experienced a decrease ranging from approximately 60% to 70% compared to the applicable period for 2024.

103.

The reduction in prescriptions has caused a dramatic decrease in profits. In January of 2024, Goodson's gross profits before cost of goods sold and operating expenses were $1,182,195.00. In January 2025, that amount was $378,196.00. After subtracting the costs of goods sold and overhead, the net operating income for January 2025 was $33,241.00. Goodson Pharmacy has experienced negative net operating income for each month from February through June 2025.

104.

Since 2024, due to the loss of profits from not being able to fill controlled substance prescriptions, Goodson Pharmacy has been required to downsize, resulting in a loss of six clerks and five technicians, a total of eleven employees. The pharmacy has reduced the hours and pay of its pharmacists.

105.

Goodson Pharmacy has lost approximately 33% of its customers due to its inability to fill controlled substances, resulting in reputational harm to and a loss of goodwill, which may never be recovered.

106.

The absence of an active Certificate of Registration has made renewal of Goodson Pharmacy's Georgia state license unnecessarily difficult due to procedural complications between the DEA and the Georgia State Board of Pharmacy and made it difficult for Goodson Pharmacy to update its National Council for Prescription Drug Programs profile, which is essential for identification with third-party payors, including the Center for Medicare and Medicaid Services, which administers Medicare Part D data.

### III.    The Georgia System of the Regulation of Pharmacies and Pharmacists.

107.

As set forth more fully herein, the Plaintiffs, like all Georgia pharmacists are subject to a comprehensive State regulatory system that has been developed, over years, in legislation and public rule-making. The Georgia system of regulation provides comprehensive regulation of the dispensing of controlled substances.

108.

The Georgia Board of Pharmacy, the Georgia Drugs and Narcotics Agency, and the Georgia Department of Public Health have created a comprehensive scheme of State regulation in order to serve the public interest. Goodson Pharmacy has, for many years, been compliant with and supportive of the Georgia regulatory scheme.

109.

The Georgia system of regulation governs the general dispensing of prescriptions, pursuant to which, *inter alia*, (i) licensed pharmacists must verify the legitimacy of prescriptions, ensuring they are issued for a legitimate medical purpose by an authorized practitioner; (ii) licensed pharmacists must not dispense prescriptions with errors, omissions, or ambiguities without contacting the prescriber for clarification; and (iii) only licensed pharmacists or interns under their direct supervision of a licensed pharmacist may accept oral prescription orders, which must be immediately reduced to writing.

110.

The Georgia system of regulation also governs the dispensing of prescriptions for controlled substances, pursuant to which, *inter alia*, (i) licensed pharmacists are responsible for the proper filling of controlled substance prescriptions, ensuring that they are not issued for improper purposes by a medical practitioner's office; (ii) licensed pharmacists must comply with the rules applicable to Schedule II, III, IV,

and V controlled substances, including requirements for documentation, security, and dispensing limits; (iii) all licensed pharmacists dispensing controlled substances must maintain detailed records, including prescription identity, dispensing information, and the pharmacy's inventory of such controlled substances; (iv) controlled substances must be properly labeled with patient information, the applicable date, and prescribing details; and (v) controlled substances in inventory must be stored securely to prevent diversion or misuse.

111.

The Georgia system of regulation also governs, in detail, the practice of pharmacy and the general conditions of a pharmacy's business, in that, *inter alia*, (i) licensed pharmacists must maintain the highest ethical standards, uphold the integrity of the profession, and safeguard the public health and safety; (ii) licensed pharmacists must avoid fraud, misrepresentation, negligence, and any dishonest dealings related to prescriptions, drugs, or medical devices; (iii) licensed pharmacists are responsible for the direct supervision of all personnel employed at their pharmacy; (iv) licensed pharmacists must personally supervise the activities of technicians in the preparation of drugs for patient delivery; (iv) licensed pharmacists must ensure that technicians and other staff are appropriately trained and that their

duties are consistent with their training and experience; and (v) pharmacy premises and pharmacy equipment must be clean and stored in sanitary conditions.

112.

Licensed pharmacists, under the Georgia system of regulation, (i) are required to provide patients with information necessary for the safe and effective use of dispensed medications; (ii) licensed pharmacists must make reasonable efforts to obtain and record patient information such as allergies, drug reactions, and concurrent medication use, and maintain these records for at least two years; (iii) licensed pharmacists must monitor and document patient responses to drug therapy, with unexpected responses reported to the prescribing physician; and (iv) report dispensed Schedule II, III, IV, and V substances to the Georgia PDMP within twenty-four (24) hours of dispensing any such medications.

113.

Under the Georgia system of regulation, retail pharmacies and licensed pharmacists who dispense controlled substances are required to register annually with the Georgia State Board of Pharmacy, as required by the Georgia Controlled Substances Act, O.C.G.A. § 16-13-20 *et seq*.

### IV.    The Unauthorized and Unlawful Regulatory Regime Created by the DEA.

114.

In contrast, the DEA's regulatory regime for pharmacists is a patchwork of informal "guidance," speeches, and *ad hoc*, informal, unwritten "rule-making" by a federal agency that seeks to be its own creator of the "rules," enforcer of the "rules," and judge of whether the "rules" have been violated.

115.

The DEA has imposed, without legislative authority, its own regulatory scheme on the Plaintiffs, on licensed pharmacists in Georgia, and on licensed pharmacists throughout the United States.

116.

The DOJ and the DEA have placed Goodson Pharmacy and Lee Goodson in an untenable position by holding them liable for violating DOJ's unwritten, informal, and *ad hoc* expectations for handling opioid prescriptions.

117.

Under federal statute, all businesses, including pharmacies, that distribute controlled substances must register with the DEA.

118.

In order to dispense controlled substances as regulated under the CSA a party must obtain a Certificate of Registration with the DEA.

119.

In order to obtain an initial DEA Certificate of Registration, a State-licensed pharmacist must submit DEA Form 224.  The Form must be accompanied by a non-refundable filing fee.  The amount of the fee varies according to the requested type of Certificate of Registration.  In general, DEA Certificates of Registration of pharmacists must be renewed through reapplication every three (3) years. The renewal fee for each pharmacist and each pharmacy location is currently $888.00.

120.

As "qualified practitioners," all pharmacists allowed under State law to prescribe controlled substances must, as required by the DEA, undergo mandatory training on substance abuse disorders before such State-licensed pharmacists are permitted to register with the DEA.

121.

The DEA's  Diversion Control Division requires a separate Certificate of Registration for each physical location where controlled substances are dispensed. The DEA asserts its right to approve each such physical location.

122.

During its 2024 investigation of Goodson Pharmacy, the DEA, without reason or justification, failed and refused to approve the Pharmacy's attempted modification, by reason of a fire that destroyed its historic location on the Courthouse Square in Cumming, Georgia.

123.

The publicly declared mission of the DEA's Diversion Control Division is to "prevent, detect, and investigate the diversion of controlled pharmaceuticals from legitimate sources while ensuring an adequate and uninterrupted supply for legitimate medical needs."  The Diversion Division has veered dramatically from this official goal and has been transformed into a misguided, over-zealous law enforcement agency.

124.

The DEA and its Diversion Control Division have sought to impose their own regulatory regime on pharmacies and pharmacists in Georgia and throughout the United States, effectively supplanting long-standing State regulatory schemes.  The regime of *ad hoc*, case-specific, unpublished "rules" of the DEA and its Diversion Control Division was never authorized by Congress in the CSA or in the DEA's enabling legislation.

125.

The DEA and its Diversion Control Division have created their *ad hoc*, informal, and unwritten rules in order to create a public perception that *all* opioid prescriptions are suspect. To this end, the DEA and its Diversion Control Division have imposed on Plaintiffs so-called "red flag" rules with respect to suspected diversions. The "red flag" rules have never been the subject of proper administrative rule-making.

126.

In the DEA's Order, the DEA demonstrates this "informal rule-making," stating the following:

> Agency precedent denotes corresponding responsibility as requiring a pharmacy to resolve "red flags" before dispensing a prescription: '[A] pharmacist or pharmacy may not dispense a prescription in the face of a red flag (i.e., a circumstance that does or should raise a reasonable suspicion as to the validity of a prescription) unless he or it takes steps to resolve the red flag and ensure the prescription is valid. *Holiday CVS*, 77 Fed. Reg. at 62,341; *see Jones Total Health Care Pharmacy, L.L.C.*, and *SND Health Care, LLC*, 81 Fed. Reg. 79,188, 79,218-19 (2016); *E. Main St. Pharmacy*, 75 Fed. Reg. 66,149, 66,150 (2010).

127.

Under the DEA's "guidance," a pharmacy must not dispense a prescription unless it resolves all red flags surrounding it. The DEA has emphasized that "[r]ed flags are circumstances surrounding a prescription that cause a pharmacist to take

pause, including signs of diversion or the potential for patient harm." *Gulf Med Pharmacy*, 86 Fed. Reg. 72,694, 72,703 (2021). The presence of a "red flag" does not prohibit a pharmacist from filling a prescription, but "means that there is potential concern with the prescription, which the pharmacist must address and resolve, and make a record of its resolution, assuming it is resolvable." *Id*.

128.

The DEA can point to no specific federal or Georgia statute or regulation that codifies these so-called "rules." Rather, these "rules" appear to be the product of ALJ's issuing decisions in isolated adjudicatory proceedings, based upon a discrete evidentiary record.

129.

These purported standards lack the force of law and have not been promulgated through the formal rule-making processes. As such, the DEA's approach is not only arbitrary and capricious but also legally unsupported.

130.

The presumption of illegality created by the DEA and its Diversion Control Division ignores its own public acknowledgements that opioid medications are often medically necessary and essential. For example, patients suffering traumatic injuries

from automobile accidents or work-related incidents cannot be given life-saving care until pain is abated by powerful prescription opioids.

131.

The informal positions of the DEA and its Diversion Control Division are effectively contrary to the Department of Health and Human Services' finding by its Pain Management Best Practices Inter-Agency Task Force that tens of millions of Americans properly rely on legal prescription opioids to treat acute or severe chronic pain. Such critical medical uses of opioids arise from forms of cancer, degenerative illnesses, terminal conditions, and other pain-related conditions for which opioids are approved by the Food and Drug Administration. Physicians skilled in the treatment of such conditions write legitimate prescriptions for opioids every day across the United States and in Cumming, Georgia.

132.

For decades, Goodson Pharmacy has properly and validly filled such prescriptions. The DOJ, the DEA, and its Diversion Control Division now seek to stigmatize such medical care and to, effectively, drive this third-generation pharmacy out of business. Such administrative efforts are "arbitrary and capricious" and contrary to the stated goals of the Diversion Control Division.

133.

According to its publicly stated mission on its website, the DEA Diversion Control Division's diversion investigations involve (i) pharmacists who falsify records and subsequently sell the drugs; (ii) employees who steal from inventory and falsify orders to cover illicit sales; (iii) prescription forgers; and (iv) individuals who commit crimes in order to obtain controlled substances.

134.

As a result of the seemingly endless investigation of Plaintiffs, it has been established beyond doubt, that Plaintiffs have *never* falsified records and subsequently sold the drugs.

135.

As a result of the DEA's exhaustive investigation of Plaintiffs, it has been established, beyond any doubt, that employees of Plaintiffs have *never* stolen from inventory or falsified orders in order to cover illicit sales.

136.

The DEA's long-running investigation of Plaintiffs uncovered *no* forged prescriptions, and no controlled substances that had been taken in the commission of crimes.

137.

Rather, the DEA now seeks to revoke the Plaintiffs' Registration for the supposed "violation" of "rules" that the DEA and its Diversion Control Division have fabricated.

138.

The United States Congress, through the CSA, tasked the DEA with the responsibility for creating a regulatory regime for opioids.

139.

In the CSA, Congress specifically required that enforcement of the CSA was to be affected in a manner that preserves legitimate patients' access to pain-relief opioids prescribed by their physicians, while preventing diversion, misuse, and abuse.

140.

Congress has tasked the DEA with regulating, in the public interest, each step in the opioid manufacturing and distribution supply chain, including quota limitations on supply; mandatory manufacturers' registration; mandatory distributors' registrations; and, of present relevance, pharmacy registrations.

141.

Rather than enforce opioid regulation on each element of the opioid supply chain, the DOJ and DEA, and the DEA's Diversion Control Division, have chosen to create an *ad hoc*, informal, unwritten, unpublished regulatory regime that is imposed on retail pharmacists and has, in fact, been imposed on Goodson Pharmacy and Lee Goodson.

142.

The DEA has allowed its Diversion Control Division to utilize its *ad hoc*, informal, unauthorized, and unlawful "rules" to revoke the controlled substance registrations of pharmacies, including Goodson Pharmacy, and of pharmacists, including Lee Goodson, and all of his colleagues at Goodson Pharmacy.

143.

The DOJ and the DEA's draconian regulatory scheme, unlike the Georgia regulatory system, cannot be found in the text of any Congressional action or in any public rule-making activity of the DEA or the DOJ.  The regulatory scheme imposed on Plaintiffs exists, if at all, in various ALJ orders, public letters, "guidance" from the DEA, and miscellaneous presentations by DEA officials.  This "guidance" from the DEA is not law and flaunts the long-standing mandates of the APA.

144.

The United States is in present and dire need of an aggressive and effective opioid control policy.  The DOJ and the DEA have been tasked by Congress with providing such a regulatory and law enforcement regime.  But DOJ and DEA have "outsourced" that charge to the Nation's pharmacists, including the Plaintiffs. Rather than vigorously investigating physicians before providing them with prescribing power for controlled substances or vigorously revoking the prescribing privileges of suspicious physicians, DOJ and DEA have transposed the responsibility imposed on them by Congress to pharmacists, such as the Plaintiffs.

145.

The suspension and attempted revocation by the DEA of the Plaintiffs' Registration was arbitrary, capricious, and unlawful in all respects.  Such actions were without any basis in law or fact and were an irrational over-reach of federal administrative power, driven by the bias, personal animus, and prejudice of the investigating officers.

146.

Under the regulatory regime that has been imposed by the DEA and the DOJ, when the Plaintiffs are presented with an opioid prescription written by a physician who is licensed by the Georgia medical board and registered with the DEA to

prescribe controlled substances, the Plaintiffs must make a decision that threatens their continued professional existence. Plaintiffs can accept the physician's medical judgment and fill the opioid prescription or supplant the physician's judgment and refuse to fill the prescription. Either decision places the Plaintiffs at grave risk.

147.

The impact of the DOJ and DEA's regulatory regime on Plaintiffs is not speculative or potential. The regulatory regime imposed by the DOJ and DEA on Plaintiffs has exposed Plaintiffs to a seemingly endless federal investigation, potential civil liability and criminal prosecution, potential loss of State licensure, and the loss of the ability to dispense controlled substances, all for filling facially valid opioid prescriptions that the DOJ and DEA now claim, in hindsight, should not have been filled. If Plaintiffs had not filled such facially valid prescriptions, the patient could have been harmed for not receiving medically needed medications. If Plaintiffs had not filled such facially valid prescriptions, Plaintiffs faced loss of licensure for the unauthorized practice of medicine.

148.

Ostensibly, the DEA provides in its public regulations a method for administrative review by an ALJ. However, the DEA provided only one ALJ for all cases arising in the United States. And now there are none.

149.

Moreover, on information and belief, and based upon a review of the reported ALJ orders published in the Federal Register, rarely, if ever, are suspensions of a Certificate of Registration reversed by an ALJ.

150.

Counsel for Goodson Pharmacy have thoroughly reviewed the Federal Register and examined many ALJ decisions in Order to Show Cause proceedings. To date, counsel has not identified a single case in which an ALJ has ruled in favor of a pharmacy over the DEA.

151.

On information and belief, there are no instances where an ALJ hired by the DEA sided with the pharmacy over the DEA in Order to Show Cause proceedings. A system in which the reviewing judge always sides with the agency is not consistent with American constitutional notions of Due Process.

152.

The DEA has failed to provide an effective system for review of decisions made under its unlawful, informal, unwritten, and unauthorized "rules."

153.

The DOJ and DEA's regulatory regime is contrary to the Georgia statutes and regulations that control the practice of pharmacy and the practice of medicine. The DOJ and the DEA have chosen to interfere with the doctor-patient relationship by usurping the  professional medical judgments of physicians and imposing them on pharmacists.

154.

Retail pharmacists, such as Plaintiffs, do not have access to patients' medical records and are not medically trained to examine and diagnose patients. Nevertheless, the DOJ and the DEA, absent the intervention of this Court, will continue to require that Plaintiffs insert themselves into physician-patient relationships and second-guess facially valid opioid prescriptions that have been written by prescribers who are registered and in good standing with the DEA.

155.

The DEA and its Diversion Control Division have shifted to retail pharmacists, such as Plaintiffs, the regulatory responsibilities that Congress assigned to the DEA. In a circumstance such as this, administrative rule-making could, through public notice and comment and hearings, resolve the dilemma imposed on Plaintiffs.

156.

Without a mandatory direction from this Court, the DEA and its Diversion Control Division will continue its lawless punishment of Plaintiffs for meeting the demonstrable medical needs of its pharmacy patients in Cumming and Forsyth County.

## COUNT ONE

### Violation of Due Process and the Separation of Powers Doctrine--*Axon Enterprise, Inc. v. Federal Trade Commission,* 598 U.S. 175 (2023).

157.

Plaintiff hereby incorporates by reference the allegations of Paragraphs 1–23, 25–47, 51–156 in this Count One, to have the same force and effect as if fully re-alleged and re-stated herein.

158.

Under *Axon,* individuals and corporations are able to challenge the constitutionality of an administrative agency's structure, general procedures, and very existence, in federal court, without having to exhaust internal procedures first.

159.

As in *Axon,* the DEA's combined investigative, prosecutorial, and adjudicative functions, together with the nature of its ALJs, violate Due Process and the separation of powers doctrine.

160.

With respect to the separation of powers argument, Axon challenged the structure of the FTC, specifically the "for-cause" removal protections afforded to its ALJs, which insulated the agency from Presidential oversight and violated Article II of the Constitution.

161.

The FTC's legal deficiencies are generally applicable to all federal administrative agencies, including the DEA, an arm of the Department of Justice.

162.

The DEA's ALJ system is unconstitutional by reason of the fact that DEA's ALJ is an "unconstitutional decision maker" as a result of the lack of appropriate removal controls.

163.

In a recent case filed by Reverend Father Emmanuel Lemelson against the Securities and Exchange Commission, Civil Action No. 1:24-cv-2415, the DOJ filed a *Notice of Change in Position* whereby it declined to defend the constitutionality of the ALJ system against the argument that it violates separation of powers and Article II of the Constitution because ALJs are impermissibly insulated from removal by the President. *See Notice of Change in Position* at 1, *Lemelson v. SEC*, No. 1:24-cv-

2415 (D.D.C. June 10, 2024), ECF No. 16.

164.

Upon information and belief and based upon a review of the ALJ's Orders to Show Cause proceedings, it is exceptionally rare, if not unprecedented, for the DEA to reverse a suspension following an adjudicative hearing. The adjudicatory processes of the DEA are not an effective or meaningful source of administrative review.

165.

Plaintiffs have, thus far, been denied any meaningful hearing or adjudicatory process. Therefore, the DEA's process is fundamentally unfair and unconstitutional.

166.

The provision, by the DEA, of only one ALJ for the entire United States is, inherently, a failure of Due Process.

167.

The approval by the former ALJ of the DEA's "red flag" presumptions is itself a denial of Due Process.

168.

Plaintiffs cannot obtain meaningful review of this claim through the DEA's administrative process.

169.

Plaintiffs' claim is wholly collateral to the merits of the underlying enforcement action.

170.

Plaintiffs raise structural constitutional questions that lie outside the DEA's institutional competence and adjudicatory authority.

## COUNT TWO

## Procedural Due Process—Failure to Provide a Hearing

171.

Plaintiff hereby incorporates by reference the allegations of Paragraphs 1–23, 25–47, 51–60, 62–106, 114–156, and 164–167 in this Count Two, to have the same force and effect as if fully re-alleged and re-stated herein.

172.

The DEA has deprived the Plaintiffs of valuable property rights from Plaintiffs and the Plaintiffs without providing Plaintiffs with an opportunity to be heard and to prove their innocence of the alleged violations.

173.

The Fifth Amendment mandates that no person may be deprived of property by the Government of the United States without Due Process of law.  The most fundamental aspect of Due Process is a hearing before an impartial decision-maker.

174.

The DEA has violated Plaintiff's procedural Due Process rights by denying its right to be heard at a meaningful time and within a meaningful manner.

175.

The Supreme Court has established that business entities, like individuals, have a right to Due Process. This specifically includes protection against governmental action that deprives the business entity of their revenue without a fair hearing.

176.

The DEA's published regulations provide for an administrative hearing in which the agency's actions can be challenged.  The DEA is irrevocably bound by this requirement to provide an administrative hearing.  *See United States* v. *Nixon,* 418 U.S. 683 (1974).

177.

In light of the departure of the DEA's only ALJ, this Court should require that

the DEA immediately appoint an ALJ, or alternatively, assign an ALJ from another administrative agency, to hear Goodson Pharmacy's administrative appeal.

## COUNT THREE

## Declaratory Judgment

### 178.

Plaintiff hereby incorporates by reference the allegations of Paragraphs 1–177 in this Count Three, to have the same force and effect as if fully re-alleged and re-stated herein.

### 179.

The DEA's *ad hoc*, informal "rules," such as its "red flag" rules and its irrebuttable presumption as to the illegality of the "Trinity Cocktail" are, thus, unlawful.

### 180.

The DEA's *ad hoc*, informal "rules" have never been approved by Congress and are, thus, unlawful, as applied to Plaintiffs.

### 181.

The DEA's *ad hoc*, informal "rules" have not been subjected to the rule-making requirements of the APA.

182.

Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) the remedy

of Declaratory Judgment is available to Plaintiffs:

> In a case of actual controversy within its jurisdiction, ... any court
> of the United States, upon the filing of an appropriate pleading, may
> ***declare the rights and other legal relations of any interested party
> seeking such declaration, whether or not further relief is or could be
> sought. Any such declaration shall have the force and effect of a final
> judgment or decree and shall be reviewable as such.*** [Emphasis
> supplied.]

Plaintiffs seek this Court's declaration to resolve disputes with the DOJ and the DEA

with respect to the obligations of Goodson Pharmacy and Lee Goodson under the

CSA.

183.

Plaintiffs seek this Court's declaratory judgment holding that

(i)     The DEA's current adjudicatory procedures are unconstitutional;

(ii)    The DEA has violated Plaintiffs' rights to both procedural and substantive

due process;

(ii)    The DEA's actions have been arbitrary, capricious, and unlawful;

(iv)    The CSA does not require Plaintiffs to second-guess a registered and

licensed physician's decision that a prescription serves a legitimate medical purpose;

(v)     The CSA and regulations do not require Plaintiffs to refuse to fill entire categories of prescriptions without regard to individual facts and circumstances;

(vi)    The CSA and its regulations do not require Plaintiffs to document in writing why the filling of a prescription was or was not appropriate, or where a "red flag" is allegedly present in a prescription, how such "red flag" was resolved;

(vii)   Plaintiffs do not have an affirmative obligation under the CSA and its regulations to analyze and share aggregate prescription data;

(viii)  The Defendants, absent legislative authority or a formal rule-making process, may not use informal, *ad hoc* "red flags" as bases for sanctions of Plaintiffs; and

(ix)    Plaintiffs are liable under the CSA and its regulations only when they fill a prescription that they know was not issued for a legitimate medical purpose by a prescriber in the usual course of the prescriber's professional practice or when the Plaintiffs knowingly abandon all professional norms and Georgia's regulatory requirements.

## COUNT FOUR

### Substantive Due Process—Fundamental Unfairness of the DEA's Regulatory Regime

184.

Plaintiff hereby incorporates by reference the allegations of Paragraphs 1–23, 25–60, 62–88, and 107–156  in this Count Four, to have the same force and effect as if fully re-alleged and re-stated herein.

185.

It is fundamentally unfair for the DEA's regulatory regime to place a pharmacist, including Lee Goodson, in an intolerable conflict between the prescribing physician and the pharmacist's patient.

186.

Substantive Due Process protects property and business rights from unfair governmental interference.

187.

The Plaintiffs' Registration is valuable property and a business right.

188.

The Fifth Amendment protects property rights from takings without Due Process.  Plaintiffs' rights to fill prescriptions for controlled substances were taken

peremptorily and arbitrarily without notice or a hearing for reasons that were illogical and irrational.

189.

It is fundamentally unfair for the DEA to create and utilize a regulatory scheme in which pharmacists are placed in the untenably conflicted position of either rejecting a questionable prescription or being exposed to sanctions for practicing medicine or filling the prescription and being subjected to the type of examination that Plaintiffs have endured.

## **COUNT FIVE**

### **Section 10 of the Administrative Procedure Act--The DEA's rules as applied to Plaintiffs are "arbitrary and capricious" and, thus, unlawful and invalid.**

190.

Plaintiff hereby incorporates by reference the allegations of Paragraphs 1–156, 164–167, 171–177 in this Count Five, to have the same force and effect as if fully re-alleged and re-stated herein.

191.

Section 10(a) of the Administrative Procedure Act, as modified and codified at 5 U.S.C. § 706, allows any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action, within the meaning of any relevant statute, to seek judicial review of such action.

192.

The scope of judicial review of the DEA's actions are plenary, as set forth in

5 U.S.C. § 706:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1)    compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2)    hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B)    contrary to constitutional right, power, privilege, or immunity;
>
> (C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D)    without observance of procedure required by law;
>
> (E)    unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F)    unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

193.

The indefinite stay of Goodson Pharmacy's administrative appeal is a "final

agency action."

194.

Additionally, the DEA's decision to issue an Immediate Suspension Order is made reviewable and may be dissolved by a court of competent jurisdiction under 21 U.S.C. § 824(d)(1).

195.

The informal, *ad hoc* rules applied to Plaintiff by the DEA are inherently "arbitrary and capricious" and without any basis of fact or law.

196.

The DEA's determination that Goodson Pharmacy's Registration presents an "imminent danger to the public" is inherently "arbitrary and capricious," because Goodson Pharmacy is not able to issue controlled substance prescriptions until at least October 2025 and the completion of its physical renovations after its fire loss.

197.

The DEA's finding that certain prescriptions lacked "a legitimate medical purpose" is arbitrary and capricious because it was made without knowledge of the patients' medical conditions or treatment regimens, further underscoring the lack of a reasoned analysis.

198.

The DEA's application of so-called "rules," which lack any basis in federal or Georgia state law or regulation, places pharmacies in an untenable position and constitutes arbitrary and capricious agency action.

199.

The DEA's decision to issue its Order was based on incomplete information and the agency's own interpretation of that limited data. When Goodson Pharmacy attempted to supplement the record with additional documentation to provide a fuller and more accurate picture, the DEA initiated these proceedings, effectively cutting off that opportunity. By doing so, and by subsequently halting the proceedings, the DEA prevented Goodson Pharmacy from presenting both documentary and testimonial evidence critical to its defense.

200.

The DEA denied Goodson Pharmacy an opportunity to address the DEA's allegations by halting the administrative proceedings.

## COUNT SIX

### Temporary, Preliminary, and Permanent Injunctive Relief and Mandamus

201.

Plaintiff hereby incorporates by reference the allegations of Paragraphs 1–200 in this Count Six, to have the same force and effect as if fully re-alleged and re-stated herein.

202.

The exercise of this Court's prohibitory and mandatory injunctive powers is necessary in order to bar the DEA from engaging in further improper, unlawful, and unconstitutional conduct.

203.

The Plaintiffs are likely to succeed on the merits of their claims, including, *inter alia*, the indisputable claim that the DEA, as a federal administrative agency, is bound by its own published regulations.

204.

The Plaintiffs, and each of them, will suffer irreparable harm if injunctive relief is not granted, including, *inter alia*, critical damage to the business of Goodson Pharmacy if it continues to be unable to offer full services to its pharmacy patients.

205.

The balance of hardships favors the Plaintiffs, in that, *inter alia*, the continued financial viability of Goodson Pharmacy will be placed in jeopardy unless mandatory injunctive relief requiring that the Plaintiffs' Registration be fully restored during the pendency of this matter.

206.

Injunctive relief is in the public interest in order to prevent further interference of the DEA with the relationship between Goodson Pharmacy and its pharmacy patients and between those patients and their prescribing physicians.

207.

Therefore, preliminary and permanent injunctive relief should be granted barring the DEA from continued constitutional, statutory, and rule-making violations.

208.

Aspects of the relief sought herein are in the nature of mandamus, in that an official of the United States is to be compelled to perform specific legal duties, including, *inter alia*, providing an adjudicatory hearing to the Plaintiffs, pursuant to the DEA's own published regulations.

209.

Plaintiffs have clear legal right to the requested relief in the nature of mandamus.

210.

Defendants, and each of them, have a clear legal duty to perform the requested actions, including, but not limited to, providing Plaintiffs with an adjudicatory hearing as provided in the DEA's own published regulations.

211.

Plaintiffs have no adequate legal remedy in order to obtain the adjudicatory hearing to which Plaintiffs are entitled, as a matter of law.

212.

The Plaintiffs, and each of them, have standing to bring this action in that they have a direct and personal stake in the outcome.

213.

The official actions that are the subject of this action are continuing and have not been remedied by the Defendants.

214.

The Plaintiffs have filed this action within a reasonable time after their right to relief arose.

215.

Mandamus is sought to compel a non-discretionary official act, i.e., to provide Plaintiffs with an adjudicatory hearing as required by the DEA's own regulations.

216.

The Defendants' failure to provide the Plaintiffs with an adjudicatory hearing, as required by the Defendants' own published regulations, constitutes a dereliction of official duties that can be remedied only through the issuance of a writ of mandamus or a mandatory injunction.

217.

The Plaintiffs request that this Court issue an Order:

(a)    Dismissing the DEA's Order to Show Cause proceedings against Goodson Pharmacy in their entirety on the grounds that the DEA's administrative adjudication process is unconstitutional and violates Goodson Pharmacy's Due Process rights under the Fifth Amendment; or, in the alternative,

(b)    (1) Dissolving the ISO pursuant to 21 U.S.C. § 824(d)(1); (2) Restraining and enjoining the DEA from taking any further action in connection with the Order to Show Cause proceedings pending this Court's final determination of

the constitutional and statutory claims asserted herein; and (3) Granting any such other and further relief as it deems appropriate.

## COUNT SEVEN

### Attorneys' Fees and Other Expenses of Litigation Pursuant to the Equal Access To Justice Act ("EAJA") and 42 U.S.C. § 1988(b).

218.

Plaintiff hereby incorporates by reference the allegations of Paragraphs 1 –217 in this Count Seven, to have the same force and effect as if fully re-alleged and re-stated herein.

219.

Attorney's fees for federal administrative over-reach and abuse, such as the DEA's pursuit of Goodson, are allowed if the DEA's position was not *"substantially justified'"* and if the Plaintiffs are *"prevailing parties."*

220.

The stated purpose of the EAJA, enacted in 1980, is to reduce the financial burden of litigation against the United States, and, thus, ensure that access to justice is not limited by financial constraints. Awards of attorneys' fees and the expenses of litigation, under the EAJA, are frequently made as a result of "arbitrary or capricious" federal administrative action.

221.

5 U.S.C. § 504(a)(1) of the Administrative Procedure Act, as amended by

section 203(a)(1) of the Equal Access to Justice Act, Pub. L. 96-451, provides:

> An agency that conducts an adversary adjudication shall award,
> to a *prevailing party* other than the United States, fees and other
> expenses incurred by that party in connection with that proceeding,
> unless the adjudicative officer of the agency finds that the position of
> the agency was **substantially justified** or that special circumstances
> make an award unjust. Whether or not the position of the agency was
> **substantially justified** shall be determined on the basis of the
> administrative record, as a whole, which is made in the adversary
> adjudication for which fees and other expenses are sought. [Emphasis
> supplied.]

222.

The EAJA, in furtherance of its broadly remedial purposes, also amended

Title 28 of the United States Code.

223.

28 U.S.C. § 2412(d) renders the United States liable for attorneys' fees and

other expenses where any other party would be liable under common law or under

the terms of any federal statute which specifically provides for such an award.

224.

Where a party has "acted in bad faith, vexatiously, wantonly, or for oppressive

reasons" attorneys' fees are recoverable under the American Rule, disfavoring fee-

shifting. *F.D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 129 (1974); *accord*

*Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 258–59 (1975).

225.

The DEA has acted in bad faith in its pursuit of the Plaintiffs.

226.

28 U.S.C. § 2412(d)(1) also renders the United States liable for attorneys' fees

and other expenses in any civil action (other than cases sounding in tort) brought by

or against the United States in any court having jurisdiction of that action, unless the

court finds that the position of the United States was ***substantially justified*** or that

special circumstances make an award unjust.

227.

The Defendants' investigation of the Plaintiffs, the suspension of the

Plaintiffs' Registration, and their defense of the present action were, and are,

"without substantial justification," within the meaning of the EAJA.

228.

As set forth in this Verified Complaint, Plaintiffs are likely to succeed on the

merits of their claims and, thus, Plaintiffs will be "prevailing parties" within the

meaning of the EAJA.

229.

As a small, community-based business, Goodson Pharmacy's costs of defense, including attorneys' fees and expenses, have threatened its continuing viability.

230.

The EAJA's statutory limitations on attorneys' fees are inapplicable to the matter *sub judice*, by reason of "special factors," including the "limited availability of qualified attorneys for the proceedings involved."

231.

In *Pierce v. Underwood*, 487 U.S. 552, 572 (1988), the Supreme Court held that an increase of fees from the statutory base rate was warranted when a matter, such as the case at bar, required "attorneys having some distinctive knowledge or specialized skill needful for the litigation in question." The present matter requires such "specialized skill."

**WHEREFORE**, the Plaintiffs, pray that this Court:

(a)    Issue its Temporary Restraining Order, prior to the trial of this matter;

(b)    Issue its Preliminary Injunction, prior to the trial of this matter;

(c)    Issue its Permanent Injunction; and

(d)    Declare that:

(i)    The DEA's current adjudicatory procedures are unconstitutional;

(ii)    The DEA has violated Plaintiffs' rights to both procedural and substantive due process;

(iii)    The DEA's actions have been arbitrary, capricious, and unlawful;

(iv)    The CSA does not require Plaintiffs to second-guess a registered and licensed physician's decision that a prescription serves a legitimate medical purpose;

(v)    The CSA and regulations do not require Plaintiffs to refuse to fill entire categories of prescriptions without regard to individual facts and circumstances;

(vi)    The CSA and its regulations do not require Plaintiffs to document in writing why the filling of a prescription was or was not appropriate, or where a "red flag" is allegedly present in a prescription, how such "red flag" was resolved;

(vii)    Plaintiffs do not have an affirmative obligation under the CSA and its regulations to analyze and share aggregate prescription data;

(viii)    The Defendants, absent legislative authority or a formal rule-making process, may not use informal, *ad hoc* "red flags" as bases for sanctions of Plaintiffs; and

(ix)    Plaintiffs are liable under the CSA and its regulations only when they fill a prescription that they know was not issued for a legitimate medical purpose by a prescriber in the usual course of the prescriber's professional practice or when the Plaintiffs knowingly abandon all professional norms and Georgia's regulatory requirements.

**PLAINTIFFS FURTHER DEMAND JUDGMENT AGAINST THE DEFENDANTS, AND EACH OF THEM, FOR:**

(a)    Reasonable attorneys' fees and the other expenses of this litigation, pursuant to **COUNT SEVEN**, as allowed by the Equal Access to Justice Act; and

(b)    Such other and further relief as this Court deems just and proper.

This 22nd day August, 2025.

Respectfully submitted,

**HASSON LAW GROUP, LLP**

**_/s/Keith S. Hasson_____**
Keith S. Hasson
Georgia Bar No. 336383
J. Tanner Lusk
Georgia Bar No. 496782

***Counsel for the Plaintiffs***

3379 Peachtree Road, N.E.
Suite 625
Atlanta, GA 30326
Telephone: 678-701-2869

keith@hassonlawgroup.com
tanner@hassonlawgroup.com

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1(C)</u>

I hereby certify that the foregoing has been prepared in 14-point Times New Roman font, as required by Local Rule 5.1(C) for the Northern District of Georgia. The foregoing has also been prepared in compliance with the margin specifications of such Rules.

This 22 day of August, 2025.

Respectfully submitted,

**HASSON LAW GROUP, LLP**

*/s/Keith S. Hasson*
Keith S. Hasson
Georgia Bar No. 336383
J. Tanner Lusk
Georgia Bar No. 496782

*Counsel for the Plaintiffs*

3379 Peachtree Road, N.E.
Suite 625
Atlanta, GA 30326
Telephone: 678-701-2869
keith@hassonlawgroup.com
tanner@hassonlawgroup.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

GOODSON DRUG CO., INC. a )
Georgia business corporation, and )
J. LEE GOODSON, )
                      )
    Plaintiffs, )
                      )
    *vs.* )       CIVIL ACTION FILE NO.:
                      )    _____
PAMELA JO ("Pam") BONDI, in her )
official capacity, TODD WALLACE )
BLANCHE, in his official capacity, )
TERRANCE C. ("TERRY") COLE, )
Administrator of the United States )
Drug Enforcement Administration, )
in his official capacity, THE UNITED )
STATES DRUG ENFORCEMENT )
ADMINISTRATION, )
                      )
    Defendants. )

## <u>VERIFICATION</u>

    **COMES NOW**, before the undersigned attesting officer, authorized by law

to administer oaths, **LEE GOODSON**, on behalf of **GOODSON DRUG CO.,**

**INC.** ("Goodson Pharmacy"), as its sole shareholder and Pharmacist in Charge,

who first being duly sworn, deposes on oath and states as follows:

1.

This Verification is given on the basis of my direct, personal knowledge.  I am above the age of majority, suffering from no disability, and fully competent to give this Verification.

2.

Goodson Pharmacy is a Plaintiff in the above-styled action in the United States District Court for the Northern District of Georgia, Gainesville Division.

3.

I have read the Verified Complaint in this matter.

4.

The allegations set forth in the Verified Complaint are all true and correct.

5.

This Verification is executed in connection with the prayer of the Verified Complaint and may be used for any proper purpose in connection therewith.

I DECLARE, UNDER PENALTY OF PERJURY, THAT THE FOREGOING IS TRUE AND CORRECT.

[Signature Page to Follow]

2

This __15__ day of August, 2025.

**GOODSON DRUG CO., INC.**
By: Lee Goodson
Title: Sole Shareholder and Pharmacist in Charge

Sworn to and subscribed before me,
at __Cumming__, __Forsyth__ County, Georgia,
this __15__ day of August, 2025.

_____
Notary Public

My Commission Expires __9/18/26__

RAKESH J SHAH
NOTARY
EXPIRES
GEORGIA
09/18/2026
PUBLIC
BARROW COUNTY

3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| GOODSON DRUG CO., INC. a<br>Georgia business corporation, and<br>J. LEE GOODSON,<br><br>    Plaintiffs,<br><br>    *vs.*<br><br>PAMELA JO ("Pam") BONDI, in her<br>official capacity, TODD WALLACE<br>BLANCHE, in his official capacity,<br>TERRANCE C. ("TERRY") COLE,<br>Administrator of the United States<br>Drug Enforcement Administration,<br>in his official capacity, THE UNITED<br>STATES DRUG ENFORCEMENT<br>ADMINISTRATION,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION FILE NO.:<br><br>_____ |

## **VERIFICATION**

**COMES NOW**, before the undersigned attesting officer, authorized by law

to administer oaths, **LEE GOODSON**, who first being duly sworn, deposes on

oath and states as follows:

1.

This Verification is given on the basis of my direct, personal knowledge. I am above the age of majority, suffering from no disability, and fully competent to give this Verification.

2.

I am a Plaintiff in the above-styled action in the United States District Court for the Northern District of Georgia, Gainesville Division.

3.

I have read the Verified Complaint in this matter.

4.

The allegations set forth in the Verified Complaint are all true and correct.

5.

This Verification is executed in connection with the prayer of the Verified Complaint and may be used for any proper purpose in connection therewith.

I DECLARE, UNDER PENALTY OF PERJURY, THAT THE FOREGOING IS TRUE AND CORRECT.

[Signature Page to Follow]

2

This __15__ day of August, 2025.

_____
LEE GOODSON

Sworn to and subscribed before me,
at _____, _____ County, Georgia,
this __15__ day of August, 2025.

_____

Notary Public

My Commission Expires __09|18|26__

3