# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# GAINESVILLE DIVISION

GOODSON DRUG CO., INC., and
J. LEE GOODSON,

     Plaintiffs,

     v.

PAMELA JO BONDI, in her official
capacity, TODD WALLACE
BLANCHE, in his official capacity,
TERRANCE C. COLE, in his official
capacity, and THE UNITED STATES
DRUG ENFORCEMENT
ADMINISTRATION,

     Defendants.

Civil Action No.

2:25-CV-257-RWS

## ORDER

    This matter comes before the Court on Plaintiffs Goodson Drug Company,

Inc.'s and J. Lee Goodson's (collectively, "Goodson") Motion for Temporary

Restraining Order and Preliminary Injunction. [Dkt. 3 – Pltfs.' Mot. for TRO and

Prelim. Inj.]. Having reviewed the record, the Court enters the following Order.

# BACKGROUND

## I.    Factual Background

Goodson is a Georgia-licensed pharmacy that operates in Cumming, GA. For years, it has maintained a registration with the U.S. Drug Enforcement Administration (DEA) to dispense controlled substances. This dispute arises from the DEA's suspension of that registration and from the related administrative proceedings.

Goodson challenges the DEA's May 1, 2025 Order to Show Cause and Immediate Suspension of Registration ("Immediate Suspension Order" or ISO). Goodson's Complaint asserts that (1) the ISO is arbitrary and capricious under the Administrative Procedure Act, and (2) the structure of the DEA's administrative adjudicatory scheme violates both Article II of the U.S. Constitution and Goodson's Fifth Amendment procedural due process rights.[1] [See Dkt. 1, Verified Compl., Counts I, III, V, VI]. Before analyzing these claims, the Court provides some background on the Controlled Substances Act, the DEA's investigation of

---

[1] The Complaint also alleges that the DEA's adjudicative scheme violates substantive due process and that the delay in the administrative proceedings violated Goodson's procedural due process rights. [Dkt. 1, Counts II–VI]. However, Goodson did not argue substantive due process as a basis for relief in its motion. And at the evidentiary hearing, Goodson's counsel conceded the as-applied procedural due process claim resulting from any delay. The Court thus does not consider these claims herein.

Goodson, the administrative proceedings in this case, and Goodson's material allegations and evidence.

## A.    Suspension of Controlled Substances Registration

Under the Controlled Substances Act (CSA), pharmacies that dispense controlled substances must register with the Attorney General. See 21 U.S.C. § 822(a). "A separate registration shall be required at each principal place of business" of the pharmacy. Id. § 822(e). Once a pharmacy obtains registration, the CSA imposes a "corresponding responsibility" on the pharmacy. That is, prescribing practitioners may issue prescriptions only for "a legitimate medical purpose," and "a corresponding responsibility rests with the pharmacist who fills the prescription." 21 C.F.R. § 1306.04(a). So, pharmacists have a corresponding responsibility to refuse to fill prescriptions not issued for a legitimate medical purpose.

The Attorney General may deny, revoke, or suspend registrations. See 21 U.S.C. § 824(a). "The Attorney General has delegated this authority to the DEA." Jones Total Health Care Pharmacy, LLC v. Drug Enf't Admin., 881 F.3d 823, 827 (11th Cir. 2018). The DEA may suspend a pharmacy's registration "upon a finding that the registrant . . . has committed such acts as would render his registration . . . inconsistent with the public interest." 21 U.S.C. § 824(a). Before such suspension

takes effect, the DEA must serve the pharmacy with an order to show cause (OSC) why its registration should not be suspended. See id. § 824(c)(1). The pharmacy then gets a chance "to appear" at an ALJ-led hearing before the suspension. Id. § 824(c)(2)(B).

The CSA additionally allows for immediate suspension of a pharmacy's registration prior to a hearing. When serving an OSC, the DEA may also issue an ISO, but only if it finds "that there is an imminent danger to the public health or safety." Id. § 824(d)(1). The statute defines "imminent danger" to mean that "due to the failure of the registrant to maintain effective controls against diversion . . . there is a substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur in the absence of an immediate suspension of the registration." Id. § 824(d)(2). Once issued, the ISO remains effective until the administrative proceedings conclude unless the Attorney General withdraws it or unless a court of competent jurisdiction dissolves it. See id. § 824(d)(1).

**B.    The DEA's Investigation of Goodson**

The DEA began investigating Goodson in March 2024.[2] According to DEA Diversion Investigator (DI) Ethan Hutnik, from 2021 through 2024, Goodson was the highest purchaser of oxycodone by a pharmacy in this DEA Area of Responsibility. [See Dkt. 8-1 – Hutnik Decl., at ¶ 8]. This area includes Atlanta, Columbus, Athens, Macon, and Rome. [See id.]. Given Goodson's location in Cumming, the "unusually high volume" of oxycodone prompted further investigation from the DEA. [Id. at ¶ 9].

DI Hutnik requested data from the Georgia Department of Health Prescription Drug Monitoring Program (PDMP), which included records of all controlled substances that Goodson dispensed from 2019 through 2024. [Id. at ¶ 7]. The PDMP data showed several "red flags" as to Goodson. [Id. at ¶ 9]. DI Hutnik then subpoenaed Goodson's dispensing reports, patient profiles, and controlled substance reports for 38 of its patients from January 2019 to March 2024. [See id. at ¶ 10]. Goodson complied with this request. [See Dkt. 1, at ¶ 43]. Throughout this

---

[2] In 2018, the DEA investigated "record keeping violations" by Goodson. [Dkt. 8-1, at ¶ 6].  That investigation culminated in a "Memorandum of Agreement," which required Goodson to undertake reporting actions from 2019 through 2022. [See Dkt. 1, at ¶ 42; Dkt. 8-1, at ¶ 6]. Goodson complied with the terms of the agreement, and those prior violations are not at issue. [See Dkt. 1, at ¶ 42].

process, the DEA never asked any Goodson employee any questions related to the medical necessity of the prescriptions for the 38 patients. [See id. at ¶ 51].

A few months later, in November 2024, Goodson suffered a fire at its Courthouse Square location. [Id. at ¶ 45]. The fire caused Goodson to shut down, though it was up and operating again at a temporary new location within a couple of days. [See id. at ¶ 45; Dkt. 10, Pltfs.' Reply, at 13]. Goodson's new location—where it has operated since the fire—also sits near the Courthouse Square, a couple of blocks away from its burned down original location. [See Dkt. 1, at ¶ 45; Dkt. 10, at 13].

One consequence of the fire and relocation was that Goodson had to ask to modify its CSA registration. Registrations are tied to a pharmacy's physical address, so when Goodson relocated, it could no longer dispense controlled substances under its existing registration. See 21 U.S.C. § 822(e) ("A separate registration shall be required at each principal place of business . . . where the applicant manufactures, distributes, or dispenses controlled substances . . . ."). The DEA never approved Goodson's modification of registration because, according to DI Hutnik, "the investigation of red flags was ongoing." [Dkt. 8-1, at ¶ 29]. Thus, since November 2024, Goodson has been unable to dispense controlled substances. [Dkt. 1, at ¶ 47].

The investigation continued after the fire. DI Hutnik served a second subpoena on Goodson, this time seeking records for six patients, a subset of the 38 patients from the first subpoena. [See Dkt. 8-1, at ¶ 11]. Goodson again complied with this request. [See Dkt. 1, at ¶ 46]. For these six patients, DI Hutnik "noticed a general lack of notations in the patient profiles and notes identifying or resolving red flag-controlled substance prescriptions." [Id. at ¶ 12]. Again, the DEA did not ask Goodson employees any questions about the medical necessity of the prescriptions in these records, nor did it give Goodson "an opportunity to explain and supplement its production." [Dkt. 1, at ¶¶ 51, 83].

The DEA then hired Thomas E. Hamilton, Pharm. D., a Florida licensed pharmacist, as an independent expert to analyze Goodson's PDMP data and files. [See Dkt. 8-2, Hamilton Decl., at ¶¶ 10–12, 17]. Dr. Hamilton examined the profiles of eight Goodson patients, Patients R.D., T.A., L.B., L.W., C.Y., P.A., T.M., and S.P. [See id. at ¶ 12]. These eight patients constituted around 0.05% of the patients that Goodson served during the relevant time period, 2019 through 2024. [See Dkt. 1, at ¶ 60]. From these eight patient profiles, Dr. Hamilton determined that "Goodson repeatedly filled prescriptions that presented multiple 'red flags' without proper identification, documentation, or resolution." [Id. at ¶

13]. Dr. Hamilton concluded that "Goodson's failure to document resolution of the red flags discussed above violates the standard of care in Georgia." [Id. at ¶ 40].

On May 1, 2025, the DEA issued the ISO. [See Dkt. 1-1, ISO]. The ISO details the DEA's findings from its 14-month investigation, alleging that Goodson committed "numerous violations of state and federal law placing the public's health and safety in imminent danger." [Id. at 2]. Thus, although Goodson was still temporarily relocated and unable to dispense controlled substances, the DEA immediately suspended its registration. [See id. at 11]. As detailed below, the ISO discusses four different red flags as to eight Goodson patients from 2019 through 2024.

### 1.    "Drug Cocktails"

Certain "cocktails" of prescription drugs are subject to abuse and may indicate diversion. [Dkt. 8-2, at ¶ 15]. "One example is the combination of an opioid and benzodiazepine, which is commonly known as a dangerous cocktail that can lead to sedation, respiratory depression, coma, and death." [Id.] Other examples of drug cocktails are a combination of an opioid and a muscle relaxant, or a combination called the "Trinity Cocktail," which is an opioid, a benzodiazepine, and a muscle relaxant. [Id.] The ISO alleges that Goodson failed to document resolution of the "drug cocktail" red flag as to seven patients. [Dkt. 1-

1, at 5–7]. For example, in a four- to five-year span, Goodson dispensed a combination of an opioid, benzodiazepine, and muscle relaxant to patient R.D. on 41 occasions, to patient T.A. on 47 occasions, and to patient L.B. on 57 occasions. [See Dkt. 8-1, at ¶ 16]. During this time, Goodson also dispensed a combination of an opioid and benzodiazepine to patient R.D. on six occasions and to patient L.B. on seven occasions. [See id.]. In the files they reviewed, DI Hutnik and Dr. Hamilton "did not find any notations in the patient files indicating that Goodson had identified or resolved the red flags associated with these drug cocktails." [Id. at ¶ 17; Dkt. 8-2, at ¶ 24].

      2.    **"Doctor Shopping"**

Doctor shopping is a "potential concern when a patient visits multiple practitioners to obtain controlled substance prescriptions." [Dkt. 8-2, at ¶ 25]. When a pharmacist observes doctor shopping, she "should contact the physicians, alert them to the issue, coordinate with the physicians as needed, and document these conversations." [Id. at ¶ 27]. The ISO alleges that Goodson failed to document resolution of the "doctor shopping" red flag as to five patients. [Dkt. 1-1, at 8]. Between 2019 and 2024, Goodson filled prescriptions for Patient S.P. from 12 different practitioners, though these practitioners were associated with four distinct medical practices. [See Dkt. 8-2, at ¶ 28]. The other four patient profiles

had similar numbers. [See id.] In the files he reviewed, DI Hutnik "did not find any indication that Goodson had identified or resolved the red flags associated with doctor shopping." [Dkt. 8-1, at ¶ 21]. Dr. Hamilton concluded that "Goodson violated the standard of care in Georgia" because it filled controlled substance prescriptions "without first verifying the legitimacy" of them. [Dkt. 8-2, at ¶ 28].

### 3. "Long Distances"

"Patients traveling long distances to obtain or fill controlled substance prescriptions is another well-known red flag of abuse or diversion." [Id. at ¶ 29]. This red flag "is not resolved if the pharmacist does not document any circumstances explaining the distance." [Id. at ¶ 31]. The ISO alleges that Goodson failed to document resolution of the "long distances" red flag as to three patients. [See Dkt. 1-1, at 9]. At various times between 2019 and 2024, these three patients respectively traveled 565 miles, 141 miles, and 86 miles round trip to obtain controlled substance prescriptions and fill them at Goodson. [See Dkt. 8-1, at ¶ 22]. For one of these patients, T.A., Goodson's customer notes from February 2023 states "We can no longer fill for her . . . She lives 5 hours away!!!!! She says we leave out her Xanax every time as well—Stop filling for her!!!!!" [Id.] Dr. Hamilton thus concluded from the files he reviewed that Goodson dispensed

controlled substances to these patients "without appropriate resolution and documentation." [Dkt. 8-2, at ¶ 32].

### 4. "Early Refills"

"Filling or refilling controlled substance prescriptions early is another well-known red flag of abuse and diversion that must be addressed prior to dispensing." [Id. at ¶ 33]. The ISO alleges that Goodson failed to document resolution of the "early refill" red flag as to one patient, L.W. [See Dkt. 1-1, at 9–10]. L.W. received prescriptions several days early on eight occasions, all during 2019. [See Dkt. 8-2, at ¶ 35]. "Goodson's records do not indicate that Goodson identified or resolved this red flag as to Patient L.W." [Id. at ¶ 36].

### C. The Administrative Proceedings Are Stayed but Eventually Reopen

Upon receiving the ISO and OSC, Goodson timely requested review at an administrative hearing before an ALJ. [See Dkt. 1, at ¶ 62]. Goodson asked for and received an extension of time to file its prehearing statement, which it then filed. [See Dkt. 8-5, Goodson's Mtn. for Continuance; Dkt. 8-6, Order Granting Mtn. for Continuance; Dkt. 1-4, Prehearing Statement].

But two days later, the proceedings were stayed. On July 23, 2025, the ALJ assigned to Goodson's case, John J. Mulrooney, II, announced his retirement. [See Dkt. 1-5, Order Staying Proceedings]. Judge Mulrooney was the only ALJ in the

entire DEA at the time. [See id.]. Thus, upon Judge Mulrooney's retirement, Goodson's hearing was "postponed indefinitely" until the DEA could identify, appoint, and assign a new ALJ to the case. [Id.]

On October 7, Defendants notified the Court that the stay was lifted because a new ALJ had been appointed and assigned to the case. [See Dkt. 13, Order Lifting Stay]. This new ALJ, Dean C. Metry, has set Goodson's administrative prehearing status conference for October 15. [Id.]

### D.    Goodson's Challenge

Goodson challenges the ISO and OSC on multiple fronts. It argues that (1) the DEA made its findings on "incomplete information" by denying Goodson an opportunity to explain or supplement its document productions; (2) it addressed and resolved each red flag in accordance with Georgia's standard of care; (3) the DEA's "red flag" rules lack legal basis in Georgia or federal law; (4) its inability to dispense controlled substances (due to the fire) when the ISO issued undermines the DEA's "imminent danger" finding; and (5) the structure of the DEA adjudicative scheme is unconstitutional.

In support of these arguments, Goodson offers several pieces of evidence. First, Goodson attests that the ISO findings are based on "incomplete information" because "[a]t no point did the DEA interview Goodson Pharmacy's pharmacists or

the prescribing physicians of the referenced patients to assess whether these prescriptions served a legitimate medical purpose." [Dkt. 1, at ¶ 198; Dkt. 3-1, Brief ISO Mtn. for TRO and Prelim. Inj., at 9; see Dkt. 10, at 12; Dkt. 1, at ¶ 51]. "Had the DEA asked," Goodson says that it would have provided "explanatory information" addressing the documentation and resolution of the apparent red flag violations. [Dkt. 1, at ¶ 83; see id. at ¶¶ 52, 199]. Second, Goodson adduces several of the flagged patient records, providing various explanations as to how each red flag was either "inapplicable under the circumstances" or was properly addressed, documented, and resolved in accordance with Georgia's standard of care.[3] [See Dkt. 1, at ¶¶ 66, 84; Dkt. 3-1, at 8, 9, 14]. Third, Goodson offers the declarations of Robert M. Parrado, BPharm, R. Ph., and Stanford David Carr, R. Ph. [See Dkt. 11, Parrado and Carr Decls.]. Mr. Parrado is a Florida-licensed pharmacist, and Mr. Carr is a Georgia-licensed pharmacist with 15 years of experience as a Special Agent with the Georgia Drugs and Narcotics Agency (GDNA). [Id. at 7, 33]. Mr. Parrado reviewed Goodson's prescription records, patient profiles, customer notes, and PDMP documentation, and he met with Goodson employees and "personally observed the pharmacy's operations and its clientele." [Id. at 10].

---

[3] Neither party submitted the full patient records to the Court. Also, as discussed below, the parties presented some of these records to the Court at the preliminary injunction hearing but did not formally submit them as exhibits.

## II. Procedural History

Goodson filed the Complaint in this case on August 22, 2025. [Dkt. 1]. Six days later, it filed its Motion for TRO and Preliminary Injunction. [Dkt. 3]. This Motion requests that the Court dismiss the OSC proceedings in their entirety, or in the alternative, dissolve the ISO and enjoin the DEA from taking any further action in connection with the OSC proceedings pending the Court's final resolution of its claims. [See id. at 3]. The Court then ordered an expedited briefing schedule, Defendants accordingly responded on September 18, and Goodson replied on October 2. [Dkt. 7, Scheduling Order; Dkt. 8, Defs.' Resp.; Dkt. 10]. The Court held a hearing on October 9, heard oral arguments from counsel, and received exhibits. The Motion for TRO and Preliminary Injunction is now ripe for review.

## DISCUSSION

### I. Legal Standard

The standards for a temporary restraining order and preliminary injunction are identical. See Windsor v. United States, 379 F. App'x 912, 916–17 (11th Cir. 2010). To obtain either, a movant must show:

> "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."

14

Four Seasons Hotels & Resorts v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003). A preliminary injunction is "an extraordinary remedy" whose purpose is "to preserve the positions of the parties . . . until a trial on the merits may be held." Bloedorn v. Grube, 631 F.3d 1218, 1229 (11th Cir. 2011) (citing Univ. of Tex. v. Camenisch, 101 S. Ct. 1830, 1834 (1981)).

## II.    Analysis

The DEA issued the ISO upon finding that Goodson posed an "imminent danger to the public health or safety." [Dkt. 1-1, at 1]; 21 U.S.C. § 824(d)(1). In addition to immediately suspending Goodson's registration to dispense controlled substances, the DEA issued an OSC for Goodson to appear in a hearing before an ALJ as to why the DEA should not revoke its registration. [Id.]. Goodson challenges the ISO under the Administrative Procedure Act and asks the Court to dissolve and enjoin enforcement of it. [See Dkt. 3, at 3]. Goodson further challenges the OSC proceedings as unconstitutional and asks the Court to dismiss them in their entirety. [See Dkt. 3, at 3].

### A.    Goodson's Claim Under the Administrative Procedure Act

Goodson asserts that the DEA's investigation and issuance of the ISO was "arbitrary and capricious" under the Administrative Procedure Act (APA). Under the APA, "[a]gency action made reviewable by statute and final agency action for

which there is no other adequate remedy in a court are subject to judicial review."

5 U.S.C. § 704. ISOs are "made reviewable by statute" and are subject to

immediate judicial review. See 21 U.S.C. § 824(d)(1) ("A suspension under this

subsection shall continue . . . unless . . . dissolved by a court of competent

jurisdiction."); Duluth Pharmacy, LLC v. Bondi, 2025 WL 2222736, at *6 (N.D.

Ga. July 11, 2025) ("Although it is not a final agency action, [the DEA's] decision

to issue the ISO is made reviewable by a court of competent jurisdiction under 21

U.S.C. § 824(d)(1).")

A reviewing court must "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The

arbitrary and capricious standard of review applies to APA claims challenging the

issuance of an ISO under 21 U.S.C. § 824(d)." Duluth, 2025 WL 2222736, at *6

(quoting Med. Pharmacy, Inc. v. U.S. Drug Enf't Admin., 2020 WL 8679978, at *2

(M.D. La. July 3, 2020)).

This standard is "exceedingly deferential." Jones Total Health Care, 881

F.3d at 829. The court "may not substitute our judgment for that of the agency so

long as its conclusions are rational and based on the evidence before it." Id.

(quoting Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257,

1264 (11th Cir. 2009)). But courts can set aside agency action when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." Id. (quoting High Point, LLLP v. Nat'l Park Serv., 850 F.3d 1185, 1193–94 (11th Cir. 2017)).

The Court is limited in what information it may consider in its review. In determining if the DEA's actions were arbitrary and capricious, the Court generally may consider only the information that was "available to the DEA at the time it issued the ISO." Duluth, 2025 WL 2222736, at *7 (citing Evergreen Pharmacy, Inc. v. Garland, 621 F. Supp. 3d 861, 869 (N.D. Ill. 2022) ("In applying the APA's arbitrary and capricious standard, the focal point for judicial review must be the administrative record already in existence, not some new record made initially in the reviewing court.")). But in cases like this, in the ISO context, there is no certified record to review. Therefore, while parties cannot add new rationalizations to the record, the Court can consider "background information or evidence of whether all relevant factors were examined by an agency." Holiday CVS, LLC v. Holder, 839 F. Supp. 2d 145, 155 (D.D.C. 2012) (quoting AT&T Info. Sys., Inc. v. Gen. Servs. Admin., 810 F.2d 1233, 1236 (D.C. Cir. 1987)).

With that, the Court turns to whether Goodson has carried its burden on all four elements for a preliminary injunction. That is, the Court assesses whether Goodson has established a substantial likelihood of success on the merits on its APA claim, irreparable injury, that the threatened injury to it outweighs the damage that the injunction may cause the DEA, and that an injunction would not be adverse to the public interest.

First, substantial likelihood of success on the merits. Several aspects of the DEA's investigation trouble the Court and suggest that the ISO issued here was arbitrary and capricious. Goodson argues that "the DEA offers no evidence that it pointed out alleged red flags to Goodson or gave its pharmacists an opportunity to address them." [Dkt. 10, at 12]. This lack of "meaningful dialogue," Goodson avers, prevented it from clarifying or supplementing information about the patients' records. [Dkt. 3-1, at 11]. Mr. Carr—a Georgia-licensed pharmacist with 15 years of experience at GDNA investigating controlled substances and pharmacy practices in Georgia—noted that "neither the DEA nor Dr. Hamilton contacted any of the prescribing physicians or the pharmacists at Goodson Pharmacy to inquire about the medical justification for issuing or dispensing the prescriptions at issue." [Dkt. 11, at 36]. Mr. Carr opined that "this omission is unusual in the context of an

investigation." [Id.]. Mr. Parrado, a Florida-licensed pharmacist, similarly found this omission "notable." [Id. at 12].

The DEA's lack of communication with Goodson during the investigation strikes the Court as odd. While such communication is not a formal legal requirement, it seems that interviewing pharmacists and employees is a common practice before the DEA issues an ISO. See, e.g., Duluth, 2025 WL 2222736, at *7 ("DEA investigators, who were onsite at Duluth Pharmacy for three days, spoke with Duluth Pharmacy employees and managers, and DI Barr specifically spoke with Mr. Jayanthi for 30 to 45 minutes, identifying the red flag issues for him and giving him an opportunity to show how those flags were resolved."); George Pharmacy Inc. v. Barr, 2019 WL 7423550, at *2 (M.D. Fla. Sept. 23, 2019) ("[T]he DEA concluded after an inspection and interview . . . ."); Keysource Med., Inc. v. Holder, 2011 WL 3608097, at *4 (S.D. Ohio Aug. 16, 2011) ("[T]he DEA also interviewed several KMI employees on the day that the search warrant was executed."); Cardinal Health, Inc. v. Holder, 846 F. Supp. 2d 203, 223 (D.D.C. 2012) ("[The DEA] also learned of interviews with pharmacists at CVS 219 and 5195 that revealed their pharmacists' failure to understand the 'basic warning signs of diversion' . . . ."). The DEA provided no evidence or rationale for why it deviated from this practice and did not interview Goodson or provide it an

opportunity to clarify, supplement, or explain resolution of the red flags. And more to the point, the DEA's failure to interview or meaningfully communicate with Goodson casts a shadow over the record and indicates that the DEA "entirely failed to consider important aspect[s] of the problem." Jones, 881 F.3d at 829.

For example, when the DEA issued the ISO, it appears that genuine questions existed as to the proper standard of care and whether Goodson met that standard as to each red flag. On the "drug cocktails" red flag, Goodson says that it "confirmed the medical necessity of the prescription by consulting directly with the prescribing physician" and "documented these resolutions in accordance with Georgia's professional standards of pharmacy practice." [Dkt. 3-1, at 9]. At the preliminary injunction hearing, Goodson submitted evidence that its billing software employs "DUR codes," which contain information associated with each filled prescription. A pharmacist apparently modifies these DUR codes before submitting a prescription for billing. Goodson showed that its DUR codes for Trinity Cocktails indicated that it had contacted the prescribing physician to confirm the medical necessity of the prescription before filling it. Goodson believed that this practice met the standard of care in Georgia. And it says that this information was available to the DEA during the investigation, but the DEA did not subpoena it or give Goodson the chance to explain it. Moreover, neither the

ISO nor Dr. Hamilton's analysis address whether these DUR codes meet the standard of care for Georgia pharmacies. [See Dkt. 1-1; Dkt. 8-2].

As for "doctor shopping," Goodson contends that the DEA failed to consider that this red flag "lacks a clearly defined standard." [Dkt. 1, at ¶ 75]. The ISO defines doctor shopping as "when a patient visits multiple practitioners to obtain multiple controlled substance prescriptions." [Dkt. 1-1, at 7]. But Goodson cites a DEA Notice in the Federal Register that defines doctor shopping as "a scheme in which a patient obtains controlled substances from multiple treatment providers without the providers knowing of the other prescriptions." [Dkt. 1, ¶ 75 (quoting 85 Fed. Reg. 76604, 76607 (DEA 2021))]. Goodson argues that it relied on this latter definition when it filled prescriptions and that the red flag was inapplicable because the prescribing physicians could access the PDMP and learn of a patient's other prescriptions. Mr. Parrado similarly attests that "the involvement of multiple prescribers is not, in itself, indicative of doctor shopping." [Dkt. 11, at 11].

As for "long distances," Goodson adduced evidence at the hearing that it had documented and resolved this red flag. As proof to the contrary, Defendants cite Goodson's February 2023 customer notes for Patient T.A., which state that "We can no longer fill for her . . . She lives 5 hours away!!!!! She says we leave out her Xanax every time as well—Stop filling for her!!!!!" [Dkt. 8, at 17]. But Goodson

produced Patient T.A.'s full customer notes at the hearing, which showed that Goodson had stopped filling for T.A. in March 2023, pursuant to a responsive note from pharmacist J. Lee Goodson. Further, Mr. Parrado attests that based on his review of Goodson's records, each instance of long distances "was either not applicable under the circumstances or was appropriately addressed in a manner consistent with Georgia's standard of care." [Dkt. 11, at 11].

To be clear, the Court does not endeavor to resolve what the Georgia standard of care requires, nor does it decide whether Goodson's practices satisfy that standard. That would be "substitut[ing] [the Court's] judgment for that of the agency," which is improper for purposes of arbitrary-and-capricious review. Jones, 881 F.3d at 829. But the Court must consider the information that was "available to the DEA at the time it issued the ISO," Duluth, 2025 WL 2222736, at *7, including such information that the DEA failed to consider. And here, based on the record, the DEA's odd lack of communication with Goodson seems to have caused it to miss important aspects of the problem regarding the applicable standard of care and whether Goodson met that standard.

Another fact underscores this point. The record suggests that when the ISO issued, the DEA never communicated with Goodson to confirm if it would imminently return to its original location and begin dispensing controlled

substances again. Due to the November 2024 fire and relocation, Goodson could not avail itself of its CSA registration without DEA approval. See 21 U.S.C. 822(e). The DEA never approved of Goodson's modification of registration, so Goodson has been (and indeed still is) unable to dispense controlled substances from its new location. [Dkt. 8-1, at ¶ 29; Dkt. 1, at ¶ 47]. The ISO issued in May 2025, but Goodson had not planned to return to its original location "until October 2025 at the earliest" because its original site has been "undergoing repair and renovation." [Dkt. 1, at ¶ 47].

Despite this, the DEA says that it issued the ISO when it did because "Goodson's timeline for moving back into its original location was not within [the DEA's] knowledge or control." [Dkt. 8-1, at ¶ 30]. Maybe so. But again, it strikes the Court as arbitrary that the DEA neither asked Goodson nor independently investigated the relocation plans. The record suggests that Goodson would have been forthright about its relocation timeline had the DEA asked—after all, Goodson had complied with the DEA's subpoenas and with every other part of the investigation up to that point. At bottom, given the genuine questions as to the standard of care and whether Goodson posed an "imminent threat," the DEA's failure to meaningfully communicate with Goodson or provide an opportunity to explain itself was arbitrary and capricious.

Defendants offer just one justification for the lack of communication—

"DEA does not have the resources to personally brief every registrant following its

discovery of new patterns of diversion." [Dkt. 8, at 12]. Point taken. The Court is

aware that federal budgetary constraints can limit the government's ability to do its

job. But in the context of the 14-month investigation here, the Court expresses

serious doubt that the DEA lacked the resources to interview a single pharmacist or

employee to learn more about important aspects of the case. Because the DEA's

issuance of the ISO here was arbitrary and capricious, Goodson has shown the first

element for a preliminary injunction, substantial likelihood of success on the

merits.

Goodson has also clearly shown that it will suffer irreparable injury absent

an injunction. Irreparable injury may be shown by the loss of "goodwill and long-

time customers as well as the likelihood of layoffs." Yorktown Sys. Grp. Inc. v.

Threat Tec LLC, 108 F.4th 1287, 1297 (11th Cir. 2024) (citing Ferrero v.

Associated Materials Inc., 923 F.2d 1441, 1449 (11th Cir. 1991)). And while mere

"economic harm" typically is not irreparable, it may be where, as here, sovereign

immunity blocks any "adequate remedy at law to recover damages." Brantley

Cnty. Dev. Partners, LLC v. Brantley Cnty., 540 F. Supp. 3d 1291, 1318 (S.D. Ga.

2021) (citing Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d 1268,

1289 (11th Cir. 2013)); see also 5 U.S.C. § 702 (creating APA cause of action and waiving sovereign immunity only for "relief other than money damages").

Goodson has submitted evidence that it "has lost approximately 33% of its customers due to its inability to fill controlled substances." [Dkt. 1, at ¶ 105]. It has submitted evidence that "[f]or each month of 2025, Goodson Pharmacy has experienced a decrease ranging from approximately 60% to 70% [of prescriptions filled] compared to the applicable period for 2024." [Id. at ¶ 102]. This has led to a "negative net operating income for each month from February through June 2025." [Id. at ¶ 103]. Further, because of lost profits from its inability to dispense controlled substances, Goodson has had to "downsize" by laying off 11 employees and "reduc[ing] the hours and pay of its pharmacists." [Id. at 104].

Defendants respond that the ISO "does not prohibit Goodson from filling any other prescriptions or otherwise operating as a pharmacy." [Dkt. 8, at 23]. While true, the Court finds that Goodson has shown that its inability to dispense controlled substances specifically will cause it irreparable harm absent an injunction.

Defendants further contend that Goodson's "assessment of harm" "begins on November 2024, when a fire damaged Goodson's building and forced it to relocate, which is unrelated to the ISO issued in May 2025." [Id.]. Thus,

Defendants argue, Goodson cannot show how many customers left "due to the ISO." [Id. at 24]. The Court disagrees. As discussed above, the fire and relocation coincided with Goodson's inability to dispense controlled substances. The Court finds that on the record before it, the more likely cause of Goodson's harm was the cessation of dispensing controlled substances. Right after the fire, Goodson was up and operating within a matter of days at a new location just a block away from its original location, undermining that the fire was the cause of the harm. [See Dkt. 1, at ¶ 45; Dkt. 10, at 13]. Additionally, the harm is imminent because Goodson plans to return to its original location this very month, October 2025, but will be unable to dispense controlled substances due to the ISO. [Dkt. 1, at ¶ 47]. In sum, Goodson has established that it will suffer irreparable injury absent a preliminary injunction enjoining enforcement of the ISO.

The Court also finds that Goodson has clearly established the third and fourth preliminary injunction elements. As to the third element, balance of hardships, the threatened injury to Goodson here is large and irreparable for the reasons explained above. The Court recognizes that the DEA has a "compelling public interest in preventing the distribution of controlled substances without adequate controls against diversion." [Dkt. 8, at 25]. The Court's decision in no way discounts the importance of this interest. But here, the DEA can protect that

interest through its speedy administrative process, which is set to begin on October 15, 2025.[4] [See Dkt. 13]. Goodson has thus shown the third element. The fourth element, public interest, is a closer call. The public clearly has a substantial interest in having the DEA prevent the dispensing of controlled substances without proper safeguards. However, the public also has an interest in limiting arbitrary actions by government agencies, particularly when those actions may directly impact the public's access to needed controlled substances. The Court recognizes that, at this stage of the proceedings, the record is not fully developed on these issues. However, the Court finds that Goodson has made a sufficient showing to satisfy this fourth element. Accordingly, the Court finds that Goodson has met its burden as to all four preliminary injunction elements on its APA claim, and therefore, enjoining enforcement of the ISO is appropriate in this case.

### B. Goodson's Constitutional Claims

Goodson next asserts that the OSC and related administrative proceedings are unconstitutional under Article II and the Fifth Amendment of the U.S. Constitution, as well as under Axon Enterprises, Inc. v. FTC, 143 S.Ct. 890

---

[4] As discussed in Section II.B below, the Court declines to dismiss the OSC proceedings.

(2023).[5] Thus, Goodson asks the Court to dismiss these proceedings in their entirety. [See Dkt. 3, at 3]. As previewed above, the Court declines to grant injunctive relief as to these constitutional claims because Goodson has failed to establish substantial likelihood of success on the merits of each.[6]

First, Goodson argues that "the DEA's ALJs function as unconstitutional decision-makers, lacking appropriate removal controls in violation of Article II of the Constitution."[7] [Dkt. 3-1, at 22]. Defendants respond that they do not defend the constitutionality of ALJ removal protections.[8] [See Dkt. 8, at 22]. Still,

---

[5] The APA does not grant the Court power to consider the OSC. The OSC is not a "final agency action," nor is it "made reviewable by statute." 5 U.S.C. § 704; cf. 21 U.S.C. § 824(d). However, the Supreme Court held in Axon that federal district courts may entertain certain "extraordinary claims" regarding an agency's constitutionality. 143 S.Ct., at 897. The parties do not discuss in detail if the Court has jurisdiction to consider Goodson's constitutional claims under the three-factor test from Axon and Thunder Basin Coal Co. v. Reich, 114 S.Ct. 771 (1994). But because the Court rejects each of Goodson claims on the merits, it assumes without deciding at this stage that it has jurisdiction.

[6] Because likelihood of success is "generally the most important" of the four injunctive relief elements, the Court does not analyze the remaining elements. Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1232 (11th Cir. 2005).

[7] Goodson also raised an Appointments Clause argument in its reply brief, [see Dkt. 10, at 10], but conceded it at the hearing.

[8] The Court does not address the constitutionality of the so-called dual layer removal protection for DEA ALJs. Though caselaw suggests that these protections are constitutional. See Rabadi v. DEA, 122 F.4th 371, 376 (9th Cir. 2024) ("[W]e conclude that the removal protections under 5 U.S.C. § 7521 are constitutional as

Defendants contend that Goodson has failed to show that the DEA ALJ removal protection "inflicted compensable harm" on it as required by <u>Collins v. Yellen</u>, 141 S.Ct. 1761 (2021). [<u>Id.</u>].

The Eleventh Circuit requires a showing of compensable harm to succeed on a removal claim. The harm must flow "as a result of" the unconstitutional removal protection. <u>See</u> <u>Battat v. Commissioner</u>, 2025 WL 2652443, at *4 (11th Cir. Sept. 16, 2025) ("[E]ven if the [plaintiffs] are correct that § 7443(f)'s for-cause removal requirement is unconstitutional, they are not entitled to relief because they have failed to show that they have suffered any compensable harm as a result of the asserted unconstitutionality . . . ."). The Court agrees with Defendants that the issuance of an ISO or OSC is not a compensable harm that flows as a result of an unconstitutional removal protection. <u>See, e.g.</u>, <u>Northside Pharmacy, LLC v. DEA</u>, 2025 WL 1671619, at *4 (S.D. Tex. May 16, 2025) ("[T]he DEA's administrative review process by a lawfully appointed ALJ is not inherently voided by the alleged unconstitutionality of the ALJ removal protections."); <u>Simfa Rose Pharm. Specialty, Inc. v. Bondi</u>, 2025 WL 2732566, at *15 (S.D. Fla. Aug. 25, 2025) (noting that plaintiff's allegations "fall far short of the actual harm and causal

---

applied to DEA ALJs."); <u>Walmart, Inc. v. Chief Admin. L. Judge of Off. of Chief Admin. Hearing Officer</u>, 144 F.4th 1315, 1348 (11th Cir. 2025) (upholding constitutionality of similar removal protections afforded to OCAHO ALJs).

connection required by Collins" because plaintiff "fails to allege that the challenged removal restriction impeded the President's ability to remove [DEA] ALJ Wallbaum and how such restriction adversely affected [plaintiff's] minimal participation in the revocation proceeding"), report and recommendation adopted, 2025 WL 2717151 (S.D. Fla. Sept. 24, 2025). Accordingly, Goodson cannot show a substantial likelihood of success on its removal claim.

Second, Goodson argues that the OSC proceedings inherently jeopardize its Fifth Amendment due process rights because "the DEA is investigator, prosecutor, and judge." [Dkt. 10, at 7]. For starters, Goodson raised this argument for the first time in its reply brief, so the Court need not consider it. See Williams v. Hill, 2022 WL 1715212, at *4 (N.D. Ga. Mar. 31, 2022). Still, courts have generally rejected this kind of "mixed function" claim absent a showing of "special facts and circumstances" showing "a risk of actual bias or prejudgment." Simfa Rose, 2025 WL 2732566, at *11 (quoting Withrow v. Larkin, 95 S.Ct. 1456, 1464, 1470 (1975) (discussing "presumption of honesty and integrity in those serving as adjudicators")). While Goodson contends that "it is exceptionally rare" for a DEA ALJ to side with a pharmacy, Defendants respond that there are "numerous instances when an ALJ ruled in favor of a Respondent" in an OSC proceeding. [Dkt. 1, at ¶ 164; Dkt. 8-5, Julie Hamilton Decl., at ¶ 7]. Goodson's showing of

special circumstances is especially questionable considering that a new slate of ALJs were recently appointed. [Dkt. 13]. Accordingly, at this stage, Goodson cannot show a substantial likelihood of success on its mixed functions claim, and the Court declines to grant injunctive relief as to any of Goodson's constitutional claims.

## CONCLUSION

For the foregoing reasons, Goodson's Motion for Temporary Restraining Order and Preliminary Injunction [Dkt. 3] is **GRANTED in part** and **DENIED in part**. The Motion is granted such that Defendants or anyone acting on their behalf are prohibited from enforcing the May 1, 2025 Immediate Suspension of Registration against Goodson. The Order to Show Cause at an administrative hearing before the DEA on October 15, 2025, remains in effect. It is further **ORDERED** that to effectuate relief, Defendants shall immediately return any of Goodson's registrations, prescription pads, or forms taken from it in connection with the May 1, 2025 Immediate Suspension of Registration; Defendants shall also unseal and return any controlled substances taken from Goodson in connection with the same. This order will remain in force until the Court holds a permanent injunction hearing in this matter and issues a final order therewith.

**SO ORDERED** this 15th day of October, 2025.

RICHARD W. STORY
United States District Judge